IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-99

No. 261A18-3

Filed 19 August 2022

NORTH CAROLINA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE

v.

TIM MOORE, in his official capacity, and PHILIP BERGER, in his official capacity.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 273 N.C. App. 452 (2020), reversing an order entered on 22 February 2019 by Judge G. Bryan Collins, Jr. in Superior Court, Wake County. Heard in the Supreme Court on 14 February 2022.

*Southern Environmental Law Center, by Kimberley Hunter and David Neal; and Irving Joyner; and Forward Justice, by Daryl V. Atkinson, Caitlin Swain, and Kathleen E. Roblez, for plaintiff-appellant.*

*Nelson Mullins Riley & Scarborough LLP, by D. Martin Warf and Noah H. Huffstetler, III, for defendant-appellees.*

*ACLU of North Carolina Legal Foundation, by Jaclyn Maffetore, Leah J. Kang, and Kristi L. Graunke, for American Civil Liberties Union of North Carolina, amicus curiae.*

*Paul Hastings, LLP, by Lindsey W. Dieselman, for Brennan Center for Justice at New York University School of Law, amicus curiae.*

*Appellate Advocacy Clinic, Wake Forest University School of Law, by John J. Korzen, for Democracy North Carolina, amicus curiae.*

*Womble Bond Dickinson (US) LLP, by Pressly M. Millen, for Former Chairs of the North Carolina Judicial Standards Commission, amici curiae.*

*Abrams & Abrams, by Douglas B. Abrams and Noah B. Abrams; and Whitfield Bryson LLP, by Matthew E. Lee, for North Carolina Advocates for Justice, amicus curiae.*

*Jeanette K. Doran for North Carolina Institute for Constitutional Law and John Locke Foundation, amici curiae.*

*Robinson, Bradshaw & Hinson, P.A., by Robert E. Harrington, Adam K. Doerr, Erik R. Zimmerman, and Travis S. Hinman, for North Carolina Legislative Black Caucus, amicus curiae.*

*Wallace & Nordan, L.L.P., by John R. Wallace and Lauren T. Noyes; and Freshfields Bruckhaus Deringer US LLP, by Aaron R. Marcu, pro hac vice, and Shannon K. McGovern, pro hac vice, for North Carolina Legislative Black Caucus, amicus curiae.*

*Tharrington Smith, LLP, by Colin A. Shive and Robert F. Orr, for North Carolina Professors of Constitutional Law, amici curiae.*

*Stam Law Firm, PLLC, by R. Daniel Gibson; and John V. Orth, pro se, for Professor John V. Orth, amicus curiae.*

*Ellen Murphy for North Carolina Professors of Professional Responsibility, amici curiae.*

*Michael G. Schietzelt for Robert H. Edmunds Jr., Barbara A. Jackson, and Mark Martin, Retired Former Justices of the Supreme Court of North Carolina, amici curiae.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Daniel F. E. Smith, Jim W. Phillips, Jr., Eric M. David, and Kasi W. Robinson, for Roy Cooper, Governor of the State of North Carolina, amicus curiae.*

*Law Office of Christopher J. Heaney, PLLC, by Christopher J. Heaney, for Scholars of Judicial Ethics and Professional Responsibility, amici curiae.*

EARLS, Justice.

¶ 1    This case involves completely unprecedented circumstances that give rise to a novel legal issue directly implicating two fundamental principles upon which North Carolina's constitutional system of government is predicated: the principles of popular sovereignty and democratic self-rule. The issue is whether legislators elected from unconstitutionally racially gerrymandered districts possess unreviewable authority to initiate the process of changing the North Carolina Constitution, including in ways that would allow those same legislators to entrench their own power, insulate themselves from political accountability, or discriminate against the same racial group who were excluded from the democratic process by the unconstitutionally racially gerrymandered districts.

¶ 2    In the final week of the final regular legislative session preceding the 2018 general election, a General Assembly that was composed of a substantial number of legislators elected from districts that the United States Supreme Court had conclusively determined to have resulted from unconstitutional racial gerrymandering enacted legislation presenting six constitutional amendments to North Carolina voters. Some of these measures passed in the General Assembly by notably narrow margins. By this time, it had already been established that twenty-eight legislative districts were drawn in a manner that violated the Equal Protection Clause of the United States Constitution, *see Covington v. North Carolina*, 316 F.R.D. 117, 124 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017), and many other districts had

also already been redrawn to remedy this unconstitutional racial gerrymander, *see North Carolina v. Covington*, 138 S. Ct. 2548 (2018) (per curiam). The two amendments at issue in this case—Session Law 2018-119 (the Tax Cap Amendment) and Session Law 2018-128 (the Voter ID Amendment)—cleared the required three-fifths supermajority threshold by one and two votes in the House and by four and three votes in the Senate, respectively. Both amendments were ultimately ratified by a majority of North Carolina voters. In that same election, conducted using newly drawn legislative districts, the voters denied to any political party a three-fifths supermajority in either the North Carolina House or Senate.

¶ 3    What is extraordinary about these events is not that a legislative body was composed in part of legislators elected from unconstitutional districts. That has occurred on numerous occasions in recent years just in North Carolina alone. *See, e.g.*, *Stephenson v. Bartlett*, 357 N.C. 301, 314 (2003) (affirming trial court's determination that the 2002 revised legislative redistricting plans were unconstitutional); *Harris v. McCrory*, 159 F. Supp. 3d 600, 604 (holding that two North Carolina Congressional districts were unconstitutional racial gerrymanders) (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017). Rather, what makes this case so unique is that the General Assembly, acting with the knowledge that twenty-eight of its districts were unconstitutionally racially gerrymandered and that more than two-thirds of all legislative districts needed to be redrawn to achieve compliance with the

Equal Protection Clause, chose to initiate the process of amending the state constitution at the last possible moment prior to the first opportunity North Carolinians had to elect representatives from presumptively constitutional legislative districts. Indeed, neither of the parties, nor any of the amici curiae, have identified a single previous instance of a legislative body composed of a substantial number of legislators elected from unconstitutional districts attempting to exercise powers relating to the passage of constitutional amendments after it had been conclusively established that numerous districts were unconstitutional.

¶ 4  The precise legal question before us is whether a General Assembly composed of a substantial number of legislators elected due to unconstitutional gerrymandering may exercise the sovereign power delegated by the people of North Carolina to the legislature under article XIII, section 4 of the North Carolina Constitution, which authorizes the General Assembly to propose constitutional amendments "if three-fifths of all the members of each house shall adopt an act submitting the proposal to the qualified voters of the State for their ratification or rejection." The broader question is whether there are any limits on the authority of legislators elected due to unconstitutional racial gerrymandering to alter or abolish "the fundamental law of the State [that] defines the form and concept of our government." *Bazemore v. Bertie Cnty. Bd. of Elections*, 254 N.C. 398, 402–03 (1961). These questions cut to the core of our constitutional system of government: if legislators who assumed power in a

manner inconsistent with constitutional requirements possess unreviewable authority to initiate the process of altering or abolishing the constitution, then the fundamental principle that all political power resides with and flows from the people of North Carolina would be threatened.

¶ 5 We conclude that article I, sections 2 and 3 of the North Carolina Constitution impose limits on these legislators' authority to initiate the process of amending the constitution under these circumstances. Nonetheless, we also conclude that the trial court's order in this case invalidating the two challenged amendments swept too broadly. Because the legislators elected due to unconstitutional racial gerrymandering retained the authority needed to avoid "chaos and confusion in government," the trial court should have considered whether invalidating both the Voter ID Amendment and the Tax Cap Amendment was necessary "upon balancing the equities" of the situation. *Dawson v. Bomar*, 322 F.2d 445, 447 (6th Cir. 1963).

¶ 6 In particular, the trial court should have examined as a threshold matter whether the legislature was composed of a sufficient number of legislators elected from unconstitutionally gerrymandered districts—or from districts that were made possible by the unconstitutional gerrymander—such that the votes of those legislators could have been decisive in passing the challenged enactments. If not, no further inquiry is necessary, and the challenged amendments must be left undisturbed. In this case, however, the record is clear that votes of legislators from

unconstitutionally gerrymandered districts could have been decisive. Therefore, the trial court needed to also consider three additional questions: whether there was a substantial risk that each challenged constitutional amendment would (1) immunize legislators elected due to unconstitutional racial gerrymandering from democratic accountability going forward; (2) perpetuate the continued exclusion of a category of voters from the democratic process; or (3) constitute intentional discrimination against the same category of voters discriminated against in the reapportionment process that resulted in the unconstitutionally gerrymandered districts. Accordingly, we reverse the decision of the Court of Appeals that reversed the trial court's order declaring the Voter ID and Tax Cap Amendments void and remand to the superior court for further proceedings consistent with the guidance set forth in this opinion.

## I.    Background

In January 2011, the General Assembly began the process of conducting a statewide redistricting of the North Carolina House of Representatives and Senate based on the 2010 federal decennial census, pursuant to article II, sections 3 and 5 of the North Carolina Constitution. Six months later, the General Assembly approved and enacted House and Senate redistricting plans largely drafted in secret by the General Assembly's private counsel. *See Covington v. North Carolina* (*Covington I*), 316 F.R.D. 117, 126 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017); *see also* S.L. 2011-402, 2011 N.C. Sess. Laws 1804; S.L. 2011-404, 2011 N.C. Sess. Laws 1936. At the

time, North Carolina was still subject to Section Five of the Voting Rights Act, so the General Assembly sought and obtained preclearance from the United States Department of Justice. *Covington I*, 316 F.R.D. at 127.

On 19 May 2015, a group of registered North Carolina voters brought suit in the Middle District of North Carolina alleging that nine Senate districts and nineteen House districts were unconstitutional racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. A three-judge panel of the federal district court agreed with the plaintiffs that all twenty-eight districts were unconstitutional. *See id.* at 177. The court found "overwhelming and consistent evidence" that the drafters of the enacted plans intentionally prioritized race over traditional neutral districting criteria. *Id.* at 130. The court also concluded that the legislative defendants "have not carried their burden to show that each of the challenged districts was supported by a strong basis in evidence and narrowly tailored to comply with either Section 2 or Section 5." *Id.* at 176. Nevertheless, the court denied the plaintiffs' request for immediate injunctive relief postponing the upcoming 2016 general elections and instead ordered the General Assembly "to draw remedial districts in their next legislative session." *Id.* at 177. On appeal, the United States Supreme Court affirmed. *North Carolina v. Covington*, 137 S. Ct. 2211 (2017).

Following the 2016 elections, the three-judge district court panel shortened the

terms of all sitting legislators and directed the legislature to hold special elections under redrawn constitutionally compliant district maps in 2017. *Covington v. North Carolina*, 2016 WL 7667298, at \*2–3 (M.D.N.C. Nov. 29, 2016) (order). The United States Supreme Court vacated the district court's remedial order on the grounds that the court had "addressed the balance of equities in only the most cursory fashion" and failed to "adequately grapple[ ] with the interests on both sides." *North Carolina v. Covington*, 137 S. Ct. 1624, 1626 (2017) (per curiam). On remand, the district court permitted the legislators elected in 2016 to complete their terms. *Covington v. North Carolina* (*Covington II*), 270 F. Supp. 3d 881, 902 (M.D.N.C. 2017). The court noted that it was "undisputed that this violation requires redrawing nearly 70% of the state House and Senate districts, affecting over 80% of the state's voters. This constitutes one of the most widespread racial gerrymanders ever held unconstitutional by a federal court . . . ." *Id.* at 896–97.

The district court also considered the plaintiffs' argument that the legislators elected due to the unconstitutional apportionment were "usurpers" who could not validly exercise legislative powers under North Carolina law. The court agreed with the plaintiffs that

> [t]he widespread scope of the constitutional violation at issue—unjustifiably relying on race to draw lines for legislative districts encompassing the vast majority of the state's voters—also means that the districting plans intrude on popular sovereignty. . . . By unjustifiably relying on race to distort dozens of legislative district lines, and

> thereby potentially distort the outcome of elections and the composition and responsiveness of the legislature, the districting plans interfered with the very mechanism by which the people confer their sovereignty on the General Assembly and hold the General Assembly accountable.

*Id.* at 897. Still, the court concluded that there existed "no authority from [North Carolina] courts definitively holding that a legislator elected in an unconstitutionally drawn district is a usurper." *Id.* at 901. Thus, the court declined to resolve the plaintiffs' usurpers argument, explaining that because the theory "implicates an unsettled question of state law, [it] is more appropriately directed to North Carolina courts, the final arbiters of state law." *Id.*

Just before the legislators elected in 2016 left office, the General Assembly initiated the process of amending the North Carolina Constitution. Article XIII, section 4 authorizes the General Assembly to put constitutional amendments on the ballot for approval by the voters "if three-fifths of all the members of each house shall adopt an act submitting the proposal to the qualified voters of the State for their ratification or rejection." The plaintiff in this case—the North Carolina State Conference of the National Association for the Advancement of Colored People (NC NAACP)—filed suit in state court. Plaintiff claimed that this particular General Assembly could not invoke the legislature's authority under article XIII, section 4 because it was illegally composed of and tainted by usurpers who could not

legitimately exercise the people's sovereign power.[1]

¶ 12        As described in unchallenged findings of fact contained in the trial court order

giving rise to this appeal:

> 12.  In the final two days of the 2018 regular legislative session, the General Assembly passed six bills that would place six constitutional amendments before the voters: Session Laws 2018-96 (Right to Hunt and Fish Amendment), 110 (Victim's Rights amendment), 117 (First Board of Elections Amendment), 118 (First Judicial Vacancies Amendment), 119 (Tax Cap Amendment), and 128 (Voter ID amendment).
>
> 13.  Session Law 2018-128 (Voter ID amendment) passed the North Carolina House of Representatives by a vote of 74–43 and the North Carolina Senate by a vote of 33–12. In the House, the total number of aye votes was just two votes over [the] three-fifths majority required for a constitutional amendment, and in the Senate the number was just three votes over the required margin.
>
> 14. Session Law 2018-119 (Tax Cap amendment) passed the North Carolina Senate by a vote of 34–13 and passed the North Carolina House of Representatives by a vote of 73–45. In the House, the number was just one vote over the three-fifths majority required for a constitutional amendment, and in the Senate the number was just four votes over the required margin.
>
> 15. On August 6, 2018, the NC NAACP and CAC filed suit against the leadership of the North Carolina General Assembly in their official capacities ("Legislative Defendants") and the North Carolina Bipartisan State Board of Elections and Ethics Enforcement and all Board members in their official capacities ("State Board of

---

[1] Clean Air Carolina (CAC) was also initially a plaintiff in this case; however, the trial court allowed the defendants' motion to dismiss CAC for lack of standing, and that ruling is not before this Court on appeal.

Elections") challenging four of the amendment proposals: the First Board of Elections Amendment, the First Judicial Vacancies Amendment, the Tax Cap Amendment, and the Voter ID Amendment. . . .

. . . .

21.  On November 2, 2018, Plaintiffs filed a motion for partial summary judgment only as to their claim that the illegally-constituted General Assembly lacks the authority to propose constitutional amendments.

22. On November 6, 2018, an election was held in North Carolina, and the four constitutional amendments challenged in the Second Amended Complaint were on the ballot.

23. The Second Judicial Vacancies Amendment, proposed in Session Law 2018-132, and the Second Board of Elections Amendment, proposed in Session Law 2018-133, did not attain the required majority of votes to pass into law.

24.  The Voter ID amendment, proposed in Session Law 2018-128, passed.

25. The Tax Cap amendment, proposed in Session Law 2018-119, passed.

26. The November 6, 2018 election was the first to be held under the remedial maps approved by the federal courts to correct the 2011 unconstitutional racial gerrymander. *Covington v. North Carolina*, 283 F. Supp. 3d 410, 458 (M.D.N.C. 2018), *aff'd in part, rev'd in part*, 138 S. Ct. 2548 (U.S. 2018).

27. On December 28, 2018, Plaintiffs voluntarily dismissed their claims against Defendant State Board of Elections. Plaintiffs also voluntarily dismissed as moot their claims related to the Second Judicial Vacancies Amendment, proposed in Session Law 2018-132, and the

Second Board of Elections Amendment, proposed in Session Law 2018-133.

After determining that NC NAACP had standing to bring suit, the trial court entered the following conclusions of law:

> 3. Whether an unconstitutionally racially-gerrymandered General Assembly can place constitutional amendments onto the ballot for public ratification is an unsettled question of state law and a question of first impression for North Carolina courts.
>
> . . . .
>
> 5. N.C. Const art I sec. 3 states that the people of North Carolina "have the *inherent, sole, and exclusive right of regulating the internal government and . . . of altering . . . their Constitution* and form of government whenever it may be necessary to their safety and happiness" *Id.* § 3 (emphasis added). N.C. Const. art XIII mandates that this may be accomplished only when a three-fifths supermajority of both chambers of the General Assembly vote to submit a constitutional amendment for public ratification, and the public then ratifies the amendment. The requirements for amending the state Constitution are unique and distinct from the requirements to enact other legislation. The General Assembly has the authority to submit proposed amendments to the Constitution only insofar as it has been bestowed with popular sovereignty.
>
> 6. On June 5, 2017, it was adjudged and declared by the United States Supreme Court that the General Assembly was an illegally gerrymandered body. At that time, following "the widespread, serious, and longstanding . . . constitutional violation—among the largest racial gerrymanders ever encountered by a federal court—" the General Assembly lost its claim to popular sovereignty. *Covington*, 270 F. Supp. 3d at 884. The three-judge panel in [*Covington*] ruled that, under the illegal racial gerrymander, "a large swath of North Carolina citizens . . .

lack a constitutionally adequate voice in the State's legislature . . . ." *Covington v. North Carolina*, 1:15CV399, 2017 WL 44840 (M.D.N.C. Jan. 4, 2017) (order for special elections vacated and remanded, *North Carolina v. Covington* 137 S. Ct. 1624 (June 5, 2017)).

7. Curing this widespread and sweeping racial gerrymander required that over two-thirds of the North Carolina House and Senate districts be redrawn. Thus, the unconstitutional racial gerrymander tainted the three-fifths majorities required by the state Constitution before an amendment proposal can be submitted to the people for a vote, breaking the requisite chain of popular sovereignty between North Carolina citizens and their representatives.

8. Accordingly, the constitutional amendments placed on the ballot on November 6, 2018 were approved by a General Assembly that did not represent the people of North Carolina. Indeed, "[b]y unjustifiably relying on race to distort dozens of legislative district lines, and thereby potentially distort the outcome of elections and the composition and responsiveness of the legislature, the districting plans [under which that General Assembly had been elected] interfered with the very mechanism by which the people confer their sovereignty on the General Assembly and hold the General Assembly accountable." [*Covington II*,] 270 F. Supp. 3d at 897. The November 2018 general elections under remedial legislative maps were "needed to return the people of North Carolina to their sovereignty." *Id.*

9. Defendants argue that, even following the *Covington* decision, the General Assembly maintained authority to enact legislation so as to avoid "chaos and confusion." *See Dawson v. Bomar*, 322 F.2d 445 (6th Cir. 1963). It will not cause chaos and confusion to declare that Session laws 2018-119 and 2018-128 and their corresponding amendments to the constitution are void *ab initio*.

10. An illegally constituted General Assembly does

> not represent the people of North Carolina and is therefore
> not empowered to pass legislation that would amend the
> state's Constitution.
>
> 11. N.C. Session Laws 2018-119 and 2018-128, and
> the ensuing constitutional amendments, are therefore void
> *ab initio.*

The trial court entered partial summary judgment in plaintiff's favor, invalidating the two challenged constitutional amendments. Legislative Defendants appealed.

On appeal, a majority of the Court of Appeals reversed. The two judges in the majority wrote separately. In the majority opinion, Judge Dillon held that plaintiff's usurpers theory was deficient on multiple grounds, including that (1) the judiciary lacked authority under separation-of-powers principles to preclude elected members of the General Assembly from exercising a legislative power; (2) plaintiff's claim was nonjusticiable; and (3) legislators elected to represent districts subsequently deemed unconstitutional were, at a minimum, de facto officers entitled to exercise all powers delegated to the legislative branch. *N.C State Conf. of NAACP v. Moore* (*NC NAACP*), 273 N.C. App. 452, 461–64 (2020).

Judge Stroud wrote separately to "reach the same result on a more limited basis." *Id.* at 466 (Stroud, J., concurring in the result). In Judge Stroud's view, the trial court erred because the decisions of the Middle District of North Carolina and the United States Supreme Court in the *Covington* litigation placed "no limitations on the General Assembly's authority to act" and there was "no North Carolina law to

support the trial court's legal conclusions." *Id.* Judge Stroud also predicted that the trial court's order would engender chaos, because there was "no law" and "no logical way to limit the effect of the electoral defects noted in *Covington* to one, and only one, type of legislative action, and more specifically to just these two particular amendments which plaintiff opposes." *Id.* at 475. She concluded that no provisions of the North Carolina Constitution "support [the trial court's] conclusion that an illegally gerrymandered General Assembly lacks either *de facto* or *de jure* authority to approve a bill for submission of constitutional amendments to popular vote . . . [while retaining the] full authority to pass any other kind of legislation." *Id.* at 478.

Judge Young dissented. According to the dissent, the case "present[ed] a compelling issue of first impression" centered on "a narrow question, but one vital to our democracy: Can a legislature, which has been held to be unconstitutionally formed due to unlawful gerrymandering, act to amend the North Carolina Constitution?" *Id.* at 479 (Young, J., dissenting). In the dissent's view, the answer was no:

> The ramifications of such an act are clear. If an unlawfully-formed legislature could indeed amend the Constitution, it could do so to grant itself the veneer of legitimacy. It could seek, by offering amendments for public approval, to ratify and make lawful its own unlawful existence. Such an act would necessarily be abhorrent to all principles of democracy.

*Id.* Instead, the dissent reasoned that, post-*Covington*, the General Assembly was

only "permitted to engage in the ordinary business of drafting and passing legislation, regardless of any issues of gerrymandering, as to require otherwise would create 'chaos and confusion.' " *Id.* at 482. But amending the constitution "is not an ordinary matter—it is a most extraordinary matter, and one which goes beyond the day-to-day affairs of the General Assembly." *Id.* Therefore, the dissent would have held that "the General Assembly, found to be unconstitutionally formed based on unlawful gerrymandering, could not attempt to amend our Constitution without first comporting itself to the requirements thereof." *Id.* at 483.

## II.  Justiciability

At the outset, we address the Court of Appeals' conclusion, advanced by Legislative Defendants before this Court, that plaintiff's claim is nonjusticiable. Courts do not resolve claims raising "purely political question[s]." *Hoke Cnty. Bd. of Educ. v. State*, 358 N.C. 605, 618 (2004). As we recently explained, these kinds of claims

> are "nonjusticiable under separation of powers principles." *Hoke Cnty. Bd. of Educ. v. State*, 358 N.C. 605, 618 (2004). Purely political questions are those questions which have been wholly committed to the "sole discretion" of a coordinate branch of government, and those questions which can be resolved only by making "policy choices and value determinations." *Bacon v. Lee*, 353 N.C. 696, 717 (2001) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)). Purely political questions are not susceptible to judicial resolution. When presented with a purely political question, the judiciary is neither constitutionally empowered nor institutionally competent

> to furnish an answer. *See Hoke Cnty. Bd. of Educ.*, 358 N.C. at 638–39 (declining to reach the merits after concluding that "the proper age at which children should be permitted to attend public school is a nonjusticiable political question reserved for the General Assembly").

*Harper v. Hall*, 380 N.C. 317, 2022-NCSC-17, ¶ 100.[2]

¶ 17    In support of the conclusion that this case presented only nonjusticiable political questions, the Court of Appeals relied principally on *Leonard v. Maxwell*, 216 N.C. 89 (1939).[3] In *Leonard* a litigant challenged the validity of a statute on various grounds including that the General Assembly which enacted the statute "was not properly constituted because no reapportionment was made at the first session after the last census as required by Art. II, secs. 4, 5 and 6 of the Constitution." *Id.* at 98. This Court explained that we would not reach the merits of this argument because the question it presented "is a political one, and there is nothing the courts can do

---

[2] The United States Supreme Court granted a petition for writ of certiorari to review claims relating to North Carolina's congressional districts, but the issue in that case is unrelated to the question of the justiciability of state legislative redistricting claims as decided in *Harper*. *See Moore v. Harper*, 595 U.S. ____ (Jun. 30, 2022) (No. 21-1271).

[3] In addition to *Leonard*, the Court of Appeals majority opinion also appears to have relied upon various cases in which this Court "declared a district to be illegally gerrymandered based on race . . . . [but] did not enjoin our General Assembly, nor the representative elected from the illegally-drawn district, from exercising legislative authority." *NC NAACP*, 273 N.C. App. at 462 (citing *Pender County v. Bartlett*, 361 N.C. 491 (2007) and *Stephenson v. Bartlett*, 355 N.C. 354 (2002)). The Court of Appeals also noted its view that "[t]he federal panel in *Covington* did not believe that the 2017-18 Session of our General Assembly lost legitimacy, ordering the body it declared to be illegally gerrymandered to redraw the districts." *Id.* (citing *Covington*, 267 F. Supp. 3d at 665). But these cases, to the extent they are relevant, speak to the potential merits of the plaintiff's arguments or the factors a court might weigh when entering a remedial order—none of these cases in any way support the notion that the type of claim plaintiff has brought is nonjusticiable in state court.

about it," as courts "do not cruise in nonjusticiable waters." *Id.* Although it addressed a claim relating to the validity of a statute passed by a malapportioned legislature, *Leonard* is inapposite here for two reasons.

¶ 18        First, *Leonard* predates the United States Supreme Court's decision in *Baker v. Carr*, 369 U.S. 186 (1962), which established that claims challenging a legislature's failure to reapportion itself were justiciable in federal court. While *Leonard* was articulating this Court's own justiciability doctrine, it is apparent that *Leonard* reflected the then-existing consensus that all claims relating to a legislature's authority to reapportion itself were categorically nonjusticiable. Indeed, the cases the Court cites in *Leonard* in support of its justiciability holding are largely irreconcilable with the modern redistricting jurisprudence of the United States Supreme Court and this Court.[4] Since *Baker v. Carr,* this Court has routinely reviewed claims asserting that legislative districts violate the United States and North Carolina Constitutions, and we have routinely entered judgments or affirmed orders designed to remedy

---

[4] Two of the three cases the Court relied upon in *Leonard* adopt the premise that courts lack authority to remedy an unconstitutional reapportionment scheme. *See People ex rel. Fergus v. Blackwell*, 342 Ill. 223, 225 (1930) ("We have held that this court has no power, under the Constitution, to compel the Legislature to reapportion the state, as required by the Constitution."); *State ex rel. Cromelien v. Boyd*, 36 Neb. 181 (1893) ("It would seem but justice that [the constitutionally mandated reapportionment] should take effect in the succeeding congress, and we may confidently trust to that spirit of fairness so characteristic of the American people to correct the wrong. The courts, however, have no authority to [issue a remedy]."). The third case held that the question of whether a state adhered to the "proper procedure" in ratifying a proposed constitutional amendment was a nonjusticiable political question. *Coleman v. Miller*, 307 U.S. 433, 458 (1939) (Black, J., concurring).

proven constitutional deficiencies. *See, e.g., Harper*, 2022-NCSC-17, ¶ 113; *Stephenson v. Bartlett*, 355 N.C. 354 (2002). Of course, the claim at issue in this case is not a claim that the General Assembly is unconstitutionally apportioned—that question was definitively answered by the *Covington* decisions. Nevertheless, because *Leonard* was predicated on a view of judicial authority that has since been thoroughly repudiated, *Leonard* has limited relevance and is not persuasive authority with respect to justiciability.

¶ 19    Second, the nature of the claim at issue in *Leonard* was not analogous to the claim presented in this case. In the Court of Appeals' assessment, *Leonard* rejected the argument that the judiciary is empowered "to declare retroactively that our General Assembly lacked the authority to pass bills simply because some legislators were elected from unconstitutionally-designed districts, stating, '[q]uite a devastating argument, if sound.' " *NC NAACP,* 273 N.C. App. at 461 (quoting *Leonard*, 216 N.C. at 89). But the argument that this Court deemed "devastating . . . if sound" in *Leonard* was not the argument that a court possesses the authority to retroactively invalidate a statute because the legislature that enacted the statute was malapportioned; rather, it was the argument that because the constitution required the General Assembly to reapportion itself "at the first regular session convening after the return of every decennial census of population taken by order of Congress," N.C. Const. art II, §§ 3, 5, the General Assembly's failure to reapportion itself during

the first regular session after the decennial census meant there could not be a legitimately constituted General Assembly unless and until the North Carolina Constitution was amended to provide for another manner of reapportionment. *See Leonard*, 216 N.C. at 98–99 ("In other words, as the first session of the General Assembly after the 1930 census was the session directed by the Constitution to make the reapportionment, and failed to do so, it is suggested that no other session is competent to make the reapportionment . . . and that henceforth no *de jure* or legally constituted General Assembly can again be convened under the present Constitution. Quite a devastating argument, if sound."). An analogous claim in the context of this case would be the assertion that a constitutional amendment is necessary to create a new apportionment process in order to reconstitute the General Assembly as a legitimate body that can exercise legislative powers because the legislature failed to enact lawful reapportionment statutes immediately following the 2010 census. That is not an argument made by any party that is presently before this Court.

¶ 20    Absent precedent directly addressing the justiciability of the precise claim advanced by NC NAACP, we turn to general justiciability principles. This Court has previously

> recognized two criteria of political questions: (1) where there is "a textually demonstrable constitutional commitment of the issue" to the "sole discretion" of a "coordinate political department[,]" *Bacon v. Lee*, 353 N.C. 696, 717 (2001) (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691 (1962)); and (2) those questions that can be

resolved only by making "policy choices and value determinations[,]" *id.* (quoting *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).

*Harper*, 2022-NCSC-17, ¶ 112 (alteration in original). Legislative Defendants have failed to demonstrate that either circumstance is present here.

As a general matter, this Court has routinely reviewed and resolved claims alleging that an individual who purports to exercise the powers assigned to a particular governmental office may not legitimately do so. *See, e.g.*, *State v. Porter*, 272 N.C. 463 (1968); *Smith v. Town of Carolina Beach*, 206 N.C. 834 (1934); *People ex rel. Norfleet v. Staton*, 73 N.C. 546 (1875); *Keeler v. City of Newbern*, 61 N.C. 505 (1868). In these types of cases, the question is whether the individual claiming the powers of an office assumed that office in a manner satisfying the legal prerequisites for holding office, and if not, whether parties are nonetheless bound by prior actions of the putative officeholder. Once it has been conclusively determined that an officeholder did not assume office through a procedure that complied with all legal prerequisites, courts consider the applicability and scope of common law doctrines like the de facto officer doctrine to determine the validity of actions undertaken by the putative officeholder. *See, e.g.*, *Porter*, 272 N.C. at 467. The scope and applicability of a common law doctrine is a quintessential legal question this Court has long been tasked with resolving.

The fact that this case involves legislators and legislative authority does not

convert plaintiff's claim into one that requires us to make "policy choices and value determinations." The question presented in this case is not which theory of government should be adopted and which institutional design implemented to ensure that power is exercised in an effective and responsive manner—those are quintessentially political questions, and ones that have been answered by the people of North Carolina through their adoption of the North Carolina Constitution. Instead, the question is whether legislators elected due to an unconstitutional racial gerrymander could, consistent with the North Carolina Constitution, legitimately exercise the sovereign power assigned to the legislature to initiate the process of amending the constitution. This issue, at its core, is one involving the interpretation and application of constitutional provisions. *See* N.C. Const. art. I, §§ 2-3. Answering this question requires us to examine the constitutional provisions enacting a system of government founded on principles of popular sovereignty and democratic self-rule and to then determine if those provisions limit the authority of legislators who assumed office in a manner violative of the United States and North Carolina Constitutions. That is a question that this Court may, and indeed must, answer. *See, e.g., Corum v. Univ. of N.C.*, 330 N.C. 761, 783 (1992) ("This Court is the ultimate interpreter of our State Constitution."); *State ex rel. McCrory v. Berger*, 368 N.C. 633, 638 (2016) ("This Court construes and applies the provisions of the Constitution of North Carolina with finality.").

### III. Analysis

¶ 23 Although plaintiff's claim is novel, our standard of review is familiar. We review a trial court's order granting or denying summary judgment de novo. *See, e.g.*, *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 337 (2009). The sole question presented on appeal is a pure question of constitutional law, which we also review de novo. *See State ex rel. McCrory*, 368 N.C. at 639. We presume that when the General Assembly acts, it acts within constitutional boundaries, and we will only strike down an act of the General Assembly if the constitutional violation is "plain and clear." *Id.* To determine whether a constitutional violation has occurred, "we look to the text of the constitution, the historical context in which the people of North Carolina adopted the applicable constitutional provision, and our precedents." *Id.*

¶ 24 The North Carolina Constitution itself provides guidance to this Court when we are called upon to interpret constitutional provisions protecting the people of North Carolina's fundamental rights: "A frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." N.C. Const. art. I, § 35. This "solemn warning" has long informed our interpretation of the "fundamental guaranties" contained in our constitution's Declaration of Rights. *State v. Ballance*, 229 N.C. 764, 768 (1949). Thus, in examining plaintiff's claim, we begin and end with the principles codified in numerous provisions of our constitution that function as the beating heart of North Carolina's system of government: the principles

of popular sovereignty and democratic self-rule.

**A. The principles of popular sovereignty and democratic self-rule.**

In North Carolina, our constitution is "the framework for democracy." *Bazemore*, 254 N.C. at 403. Under our constitution, "[a]ll political power is vested in and derived from the people; all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole." N.C. Const. art. I., § 2. Our constitution also reserves to the "people of this State . . . the inherent, sole, and exclusive right . . . of altering or abolishing their Constitution and form of government." *Id.*, art. I, § 3. These provisions of the North Carolina Constitution express and safeguard the people of North Carolina's "revolutionary faith in popular sovereignty" as the theory of government that best promotes the liberty and equality of all persons. John V. Orth & Paul Martin Newby, *The North Carolina Statte Constitution* 48 (2d ed. 2013). In short, they establish that there is no source of political power other than the people of North Carolina; nobody but the people of North Carolina possesses the authority to redefine the purpose and structure of North Carolina's system of government.

In the system of government our constitution prescribes, the legislature "represent[s] the untrammeled will of the people" and "the expression of the people's will can only be made by legislation." *State ex rel. Abbott v. Beddingfield*, 125 N.C. 256, 270 (1899). Yet there is no legislative power independent of the people. Instead,

the constitution defines and structures political processes that allow individuals to assume offices to which the people of North Carolina have delegated sovereign power. *See Harper*, 2022-NCSC-17, ¶ 130 ("[U]nder the principle of popular sovereignty, the 'political power' of the people is channeled through the proper functioning of the democratic processes of our constitutional system to the people's representatives in government." (citing N.C. Const. art I, § 2)). These processes enable the "sovereign power" to be "*exercised* by [the People's] representatives in the General Assembly," but at all times the sovereign power "*resides* with the people." *State ex rel. Ewart v. Jones*, 116 N.C. 570, 570 (1895) (emphases added).

¶ 27        The principles of popular sovereignty and democratic self-rule as embodied in article I, sections 2 and 3 mean that individuals can only exercise the sovereign power that the people have transmitted to the legislature if they validly hold legislative office. The constitution defines and structures the processes by which individuals assume offices that permit them to exercise sovereign power, and sovereign power can only be lawfully exercised by individuals who have come into office through the processes established by the constitution for that very purpose. *See Burke v. Elliott*, 26 N.C. 355, 361 (1844) ("[A] party taking upon himself to execute process must be a *legal* officer for that purpose . . . ."). The legitimacy of any individual officer's claim to exercise sovereign power depends upon the legitimacy of the process by which that individual came to assume the office to which sovereign power has been delegated.

## B. The process of amending the North Carolina Constitution.

Consistent with the principles of popular sovereignty and democratic self-rule, only the people can change the way sovereign power is allocated and exercised within North Carolina's system of government. *See* N.C. Const. art. XIII, § 2 ("The people of this State reserve the power to amend this Constitution and to adopt a new or revised Constitution."). And, through their constitution, the people assigned the General Assembly a vital role in the amendment process. Specifically, the constitution authorizes the General Assembly to initiate the process of enacting constitutional amendments by "adopt[ing] an act submitting the propos[ed] [constitutional amendments] to the qualified voters of the State for their ratification or rejection," provided that "three-fifths of all the members of each house shall adopt [the] act." *Id.*, art. XIII, § 4. It is undisputed that three-fifths of the members of each house adopted acts submitting the proposals to add the Voter ID and Tax Cap Amendments to the North Carolina Constitution, and that a majority of voters ratified both amendments in 2018. The sole question before us is whether the legislators who passed the bills submitting these two amendments to the voters could validly exercise the authority conferred upon the legislature by the people in article XIII, section 4.

As Judge Young noted, our answer to this question has profound implications for the principles of popular sovereignty and democratic self-rule that undergird our system of government. Both parties advance plausible arguments as to why these

principles demand a ruling in their favor. We agree with Legislative Defendants that respect for the people's choice to delegate sovereign power to the legislature requires upholding the validity of legislators' actions unless it is palpably clear that their actions violate the North Carolina Constitution. We agree with NC NAACP that respect for the people's reservation of their exclusive authority to amend the constitution requires closely scrutinizing the actions of those who purport to exercise this authority under contested circumstances. Thus, in approaching the legal question presently before us, we heed the foundational commitment to the principles of popular sovereignty and democratic self-rule that are embodied in the text, structure, and purpose of the constitution the people have adopted and reaffirmed.[5]

**C. The significance of voter ratification of the challenged amendments.**

¶ 30    Before examining the legislators' authority to initiate the process of amending the North Carolina Constitution, we note the argument that this question is practically irrelevant because a majority of North Carolina voters ratified the Voter ID and Tax Cap Amendments. This argument has some superficial appeal: if what matters is safeguarding our constitutional commitment to popular sovereignty and democratic self-rule, the fact that a majority of voters approved the challenged amendments could indicate that the amendments reflected the people's will. Yet this

---

[5] These principles are not unique to North Carolina's Constitution. *See generally* Jessica Bulman-Pozen & Miriam Seifter, *The Democracy Principle in State Constitutions*, 119 Mich. L. Rev. 859 (2021).

argument is misguided in ways that illustrate the stakes at issue in this case.

¶ 31        First, this argument overlooks the fact that constitutional provisions defining the procedures elected officials must utilize in order to exercise the people's sovereign power reflect the people's conscious choices regarding how, and under what circumstances, their power may be exercised by elected representatives. These choices have meaning—they reflect the people's best efforts to structure a political system that would facilitate effective governance without fostering tyranny. *See Harriss v. Wright*, 121 N.C. 172, 178–79 (1897) ("Under our system, it is said that sovereign power resides with the people . . . . They have divided and subdivided the powers of government, with such power in each division or department or branch as they deemed expedient for the good of the public . . . ."). For this reason, we have held that when governmental entities fail to adhere to constitutional procedural requirements, their resulting actions are void. *See, e.g.*, *Allen v. City of Raleigh*, 181 N.C. 453, 455 (1921) (holding "invalid" a statute involving debt and taxation because it failed to comply with "mandatory" procedural requirements set forth in article II, section 14).

¶ 32        We have also recognized that majority approval by the voters does not cure the deficiency resulting from a violation of a legal prerequisite for presenting someone (or something) to the voters. For example, in *People ex rel. Duncan v. Beach*, we held that a judicial candidate who "was ineligible to hold office prior to and at the time of the

[ ] election due to his age" could not serve as a district court judge, even though the candidate had been elected by a majority of the voters in his district, because "[t]he votes cast for an ineligible candidate [are] not effective to entitle him to the office." 294 N.C. 713, 718 (1978). Similarly, ratification by the voters does not render the procedural requirements of article XIII, section 4 constitutionally extraneous. To conclude otherwise would flagrantly disregard the people of North Carolina's choice *not* to permit constitutional amendment by citizen initiative or popular referendum, in contrast to the choices made by the citizens of certain other states. *See* Nat'l Conference of State Legislatures, *Initiative and Referendum States*, https://www.ncsl.org/research/elections-and-campaigns/chart-of-the-initiative-states.aspx (last visited 3 August 2022).

Second, embracing this argument would also flagrantly ignore the purpose of the people's choice to structure the amendment process to require something more than ratification by the voters. The legislative supermajority requirement is not a mere procedural nicety; it is a means of safeguarding the system of government created in the North Carolina Constitution by ensuring that the people's fundamental law is not altered or abolished rashly in response to the whims of a particular moment. As we explained in *State ex rel. Attorney-General v. Knight*,

> the people, then agreeing upon the fundamental law for the present and the future, and knowing that times of agitation and popular clamor would come, while reserving the power of amendment, in their wisdom imposed a restraint upon

themselves, by making the powers of amendment slow
enough to give time for reflection before final action.

169 N.C. 333, 347–48 (1915); *cf. Allen*, 181 N.C. at 455 (explaining that a

constitutional provision imposing heightened procedural requirements for the

passage of bills addressing debt and taxation was imposed for the purpose "of

obtaining more careful deliberation on these important subjects"). If we were to

conclude that all questions regarding a legislator's authority to initiate the

amendment process are irrelevant because voters subsequently approved the

proposal, we would be ignoring the people's view of the way their power should be

exercised and replacing it with our own.

¶ 34      We reject the contention that we do not need to examine the authority of

legislators to propose the Voter ID and Tax Cap Amendments because a majority of

North Carolinians who participated in the 2018 elections subsequently ratified both

amendments. Simply put, the fact that a majority of voters ratified a constitutional

amendment is insufficient to ensure adherence to the principles that animate our

constitutional system of government as defined by the people of North Carolina.

*See Reade v. City of Durham*, 173 N.C. 668 (1917) ("No one can read . . . our

Constitution without concluding at once that no alteration is permitted by it without

the joint action of the Legislature and the people. Amendment of the organic law of

the State *does not depend upon a popular vote alone*, but before the people have a

right to express their choice as to whether or not there shall be a change the

Legislature must by a three-fifths vote of each house thereof consent and provide that the amendment shall be submitted to the people . . . ." (emphasis added)). The constitution, which "contains the permanent will of the people," incorporates the adoption of a particular procedural mechanism for exercising the people's sovereign power to alter or abolish their chosen form of government. *Knight*, 169 N.C. at 348. Respecting the people's will means respecting the processes they saw fit to include in their fundamental law. Adherence to constitutional procedural requirements is especially warranted when considering constitutional amendments which, in contrast to ordinary statutes and other governmental actions, have the potential to redefine the way sovereign power is channeled and exercised, the basic structure and organization of our government, and the aims our constitution seeks to realize.

**D. De jure officers, de facto officers, and usurpers.**

We next consider the status of the legislators who were elected from districts that were either unconstitutionally racially gerrymandered or from districts that needed to be redrawn to cure those racial gerrymanders. The crux of the parties' dispute in this case centers on competing assertions regarding those individuals' entitlement to exercise power assigned to the legislature and the status of the acts they undertook post-*Covington*. Our resolution of this dispute requires us to interpret and apply cases defining three categories of individuals who purport to hold elected offices established by the North Carolina Constitution: de jure officers, de facto

officers, and usurpers.

¶ 36     A de jure officer is one who "exercises the office . . . as a matter of right." *People ex rel. Duncan*, 294 N.C. at 719. To be a de jure officer, an individual must (1) "possess the legal qualifications for the . . . office in question;" (2) "be lawfully chosen to such office;" and (3) "have qualified . . . to perform the duties of such office according to the mode prescribed by law." *Id.* at 720. De jure officers may legitimately exercise all the powers assigned to an office because they have assumed office in accordance with all legal requirements. *See In re Wingler*, 231 N.C. 560, 563 (1950) ("These things being true, [the officeholder] has a complete title to his office; his official acts are valid; and he cannot be ousted.").

¶ 37     Based on the constitutional principles described above, it would be reasonable to presume that any individual other than a de jure officer lacks the capacity to exercise the authority assigned to a governmental office. However, this Court—and other federal and state courts—long ago concluded that such a rule would lead to chaos, undermine the orderly administration of government, and unfairly burden individuals who reasonably relied on the acts of apparent officeholders. *See, e.g.*, *Porter*, 272 N.C. at 467 ("The *de facto* doctrine was introduced into the law as a matter of policy and necessity, to protect the interests of the public and individuals, where those interests were involved in the official acts of persons exercising the duties of an office, without being lawful officers."); *cf. EEOC v. Sears,*

*Roebuck & Co.*, 650 F.2d 14, 17 (2d Cir. 1981) ("The *de facto* officer doctrine was developed to protect the public from the chaos and uncertainty that would ensue if actions taken by individuals apparently occupying government offices could later be invalidated by exposing defects in the officials' titles."). Under the common law de facto officer doctrine, an individual "who occupies a[n]. . . office under some color of right, and for the time being performs its duties with public acquiescence, though having no right in fact" may exercise the powers attendant to that office in ways that bind third parties and the public. *In re Wingler*, 231 N.C. at 563.

¶ 38        As we explained in *State v. Porter*,

> A *de facto* officer may be defined as one whose title is not good in law, but who is in fact in the unobstructed possession of an office and discharging its duties in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper. When a person is found thus openly in the occupation of a public office, and discharging its duties, third persons having occasion to deal with him in his capacity as such officer are not required to investigate his title, but may safely act upon the assumption that he is a rightful officer.

272 N.C. at 465 (quoting *Waite v. Santa Cruz*, 184 U.S. 302, 323 (1902)). A paradigmatic example of a de facto officer is someone who is validly elected to an office, but who is later determined to have been ineligible to assume that office for failure to satisfy all legal prerequisites for holding office. *See, e.g.*, *People ex rel Duncan*, 294 N.C. at 719. Until it is conclusively determined that the officeholder is

not a de jure officer, the officeholder is a de facto officer whose acts "are valid in law in respect to the public whom he represents and to third persons with whom he deals officially." *Porter*, 272 N.C. at 465–66.

¶ 39   Still, not all individuals who claim to hold an office may exercise the powers of that office. North Carolina law recognizes a third category of putative officeholders: usurpers. In contrast to a de facto officer who "goes in [to office] under *color* of authority," a usurper is an individual "who takes possession [of an office] without any authority." *People ex rel. Norfleet*, 73 N.C. at 550; *see also People ex rel. Duncan*, 294 N.C. at 720 ("A usurper in office is distinguished from a *de facto* officer in that a usurper takes possession of office and undertakes to act officially without any authority, either actual or apparent."). Essentially, a usurper is someone who purports to exercise the powers of an office that the individual has no legitimate claim to hold, provided that the invalidity of the putative officeholder's claim is readily apparent to the public. *Cf. Ellis v. N.C. Inst.*, 68 N.C. 423, 426–27 (1873) (concluding that individuals were de facto officers because they acted "under the color of an act of the Legislature" rather than usurpers who "were in without any color of title to the office"). In contrast to the acts of a de jure or de facto officer, all acts undertaken by a usurper "are absolutely void, and can be impeached at any time in any proceeding." *In re Wingler*, 231 N.C. at 564.

¶ 40   These precedents make clear that until the United States Supreme Court

conclusively determined that twenty-eight legislative districts were unconstitutional racial gerrymanders, legislators elected as a result of unconstitutional racial gerrymandering were de facto officers. These legislators were not de jure officers because they were not "lawfully chosen to such office." *People ex rel Duncan*, 294 N.C. at 719–20. Article I, section 3 establishes that "[t]he people of this State have the inherent, sole, and exclusive right of regulating the internal government . . . but every such right shall be exercised in pursuance of law and consistently with the Constitution of the United States." Our Declaration of Rights further provides that "no law or ordinance of the State in contravention or subversion [of the United States Constitution] can have any binding force." N.C. Const. art. I, § 5. The statutes creating the legislative districts from which these legislators were elected violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. *See Covington I*, 316 F.R.D. at 124, 176. Nonetheless, at least until *Covington* was decided, these legislators were "in the unobstructed possession of an office and discharging its duties in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper." *Porter*, 272 N.C. at 465 (quoting *Waite*, 184 U.S. at 323). Accordingly, they were de facto officers, and the validity of their actions undertaken during this time is not subject to collateral attack.

¶ 41        The status of these legislators after *Covington* was decided is less certain.

Plaintiff argues that these legislators were nothing more than usurpers, such that the Voter ID and Tax Cap Amendments are necessarily void. Legislative Defendants argue that, at a minimum, these legislators remained de facto officers who were entitled to exercise all the powers assigned to the legislature. Our cases, and cases from other jurisdictions interpreting these doctrines as articulated in other sources of law, do not conclusively answer this question.

¶ 42        Although we have held that an individual who assumes office "under color of an election or appointment by or pursuant to a public unconstitutional law" is a de facto officer "*before* the [law] is adjudged to be [unconstitutional]," *State v. Lewis*, 107 N.C. 967, 971 (1890) (emphasis added), we have not previously addressed a circumstance in which a party challenged actions undertaken by an officeholder *after* the law under which that official assumed office was conclusively determined to be unconstitutional. Similarly, federal cases examining the de facto officer doctrine have also centered on official acts undertaken *before* the determination that an individual's claim to an office was deficient. *See Ryder v. United States*, 515 U.S. 177, 180 (1995) ("The *de facto* officer doctrine confers validity upon acts performed by a person acting under the color of official title even though it is *later* discovered that the legality of that person's appointment or election to office is deficient." (emphasis added)). The Middle District of North Carolina was correct in stating that the question of whether the General Assembly was "empowered to act" as a legislature was and is "an

unsettled question of state law." *Covington II*, 270 F. Supp. 3d at 901.

¶ 43        Plaintiff's argument that post-*Covington*, legislators elected from unconstitutionally racially gerrymandered districts became usurpers is straightforward. To validly hold an office established by the North Carolina Constitution, an individual must assume that office in a manner consistent with the legal requirements of the United States and North Carolina Constitutions. If the individual assumes office in a manner inconsistent with those legal requirements, that individual is not a de jure officer. Plaintiff contends that once it is conclusively (and publicly) determined that an individual lacks a valid claim to an office, that individual becomes a usurper.

¶ 44        The problem with this theory is that it invites the exact problem the de facto officer doctrine was created to avoid: the chaos and confusion that would result from declaring that the people lacked any representatives empowered to exercise any legislative authority for more than a year. Conceptually, plaintiff has no answer to the question of why, if its theory is correct, *any* actions undertaken by the challenged legislators post-*Covington* can be upheld. Plaintiff emphasizes that its legal challenge is limited to these two constitutional amendments, but a usurper's actions are not just voidable in a collateral proceeding; *all* of a usurper's actions "are absolutely void." *In re Wingler*, 231 N.C. at 564.

¶ 45        In response, Legislative Defendants advance three main arguments in support

of the notion that all members of the General Assembly retained their authority to exercise all legislative powers even after *Covington* was decided. In essence, Legislative Defendants contend that the legislators remained de facto officers post-*Covington*, and that de facto officers must be permitted to exercise all of the powers delegated to a constitutional office. We agree with the first premise, but not the second.

¶ 46      Legislative Defendants' first argument is that all legislators were at a minimum de facto officers because they were "elected in 2016 before any final judgment regarding the validity or constitutionality of the districts from which they were elected; they were sworn into office; they served continually and openly; and they were recognized as members of the General Assembly until their terms expired at the end of 2018." This argument relies heavily on the fact that the federal courts overseeing the *Covington* litigation permitted the legislators to finish their terms, even though the federal courts possessed the remedial authority to order mid-term special elections. In support of this argument, Legislative Defendants cite Justice Douglas's concurrence in *Baker v. Carr*, in which he stated that a "recent ruling by the Iowa Supreme Court that a legislature, though elected under an unfair apportionment scheme, is nonetheless a legislature empowered to act . . . is plainly correct." 369 U.S. at 250 n. 5 (Douglas, J., concurring) (citations omitted). This argument posits that if a court has concluded that a legislature is unconstitutionally

gerrymandered, but permits the legislature to exercise its authority to enact a remedial redistricting plan (as courts routinely do), then it would be illogical to also conclude that members of that same legislative body were usurpers whose actions were void ab initio.

¶ 47 This argument has some force. In general, an individual remains a de facto officer as long as that individual "maintain[s] an appearance of right to [an] office." *EEOC v. Sears*, 650 F.2d at 17. The Middle District of North Carolina was correct in noting that at the time *Covington* was being litigated, there was "no authority from [North Carolina] courts definitively holding that a legislator elected in an unconstitutionally drawn district is a usurper." *Covington II*, 270 F. Supp. 3d at 901. Absent such authority, it was not unreasonable for the public to believe that, even after *Covington*, the legislators elected as a result of unconstitutional racial gerrymandering could continue exercising legislative authority until they were replaced or retained through the electoral process.

¶ 48 Historically, legislators who were determined to have been elected as a result of an unconstitutional apportionment have been permitted to continue serving in office until after the conclusion of the next general election, following which impacted districts would be redrawn in preparation for the next election cycle. *See, e.g.*, *Pender County v. Bartlett*, 361 N.C. 491 (2007). Here, no attempt was made to oust the legislators from their offices via a quo warranto action. *See* N.C.G.S. § 1-515 ("An

action may be brought by the Attorney General in the name of the State, upon his own information or upon the complaint of a private party, against the party offending . . . [w]hen a person usurps, intrudes into, or unlawfully holds or exercises any public office . . . ."). There is also a longstanding public policy against leaving public offices vacant. *See State ex rel. Markham v. Simpson*, 175 N.C. 135, 137 (1918) (noting the "sound public policy which is against vacancies in public offices and require[es] that there should always be some one [sic] in position to rightfully perform . . . important official duties for the benefit of the public . . . .").

¶ 49        At the same time, adopting this argument in full would allow the federal courts to dictate the answer to a novel question of state law. As a result, we would be compelled to read *Covington*, a case in which a federal district court expressly declined to rule on the question of whether legislators were empowered to act as a matter of North Carolina law, as establishing that the challenged legislators were empowered to exercise all legislative powers as a matter of North Carolina law. *See Covington II*, 270 F. Supp. 3d at 901 ("Given that [the argument that the legislature lacked authority to act] implicates an unsettled question of state law, [this] argument is more appropriately directed to North Carolina courts, the final arbiters of state law."). Yet questions involving the interpretation of the North Carolina Constitution and North Carolina law can be resolved conclusively only by this Court. *See, e.g.*, *Unemp. Comp. Comm'n v. Jefferson Standard Life Ins. Co.*, 215

N.C. 479, 486 (1939) (explaining that questions of state law are "to be interpreted finally by this Court").

¶ 50 Moreover, the federal courts in *Covington* did not affirmatively and proactively conclude that the unconstitutionally elected members of the General Assembly could exercise all legislative authority until they were replaced after the next election, as other courts have done.[6] Absent an express indication that a federal court considered the legislature's continued authority to act as a matter of state law, a federal court's decision to afford an unconstitutionally gerrymandered legislature the first opportunity to reapportion itself as an exercise of its remedial powers might reflect federalism interests, principles of institutional comity, or practical exigencies. Regardless, establishing legislative districts is an ordinary legislative act; recognizing the necessity of enacting remedial maps is not necessarily the same as recognizing the authority of legislators to initiate the process of changing a state's fundamental law. *Cf. Petuskey v. Rampton*, 307 F. Supp. 235, 253–54 (C.D. Utah 1969) ("Based [u]pon ideas of practicality, the ordinary, customary legislation needed

---

[6] In contrast, the Michigan Supreme Court specifically noted that legislators elected from unconstitutionally apportioned districts could "function as *de facto* officers for all valid purposes" until they were "legally succeeded" by new legislators, relying on its own precedent examining the scope of the de facto officer doctrine. *Scholle v. Hare*, 367 Mich. 176, 192 (1962); *see also Long v. Avery*, 251 F. Supp. 541, 559 (D. Kan. 1966) (supplemental opinion) ("[W]e hold that the present State Senate should be permitted to a continuance of its powers during the current term for which the members of the State Senate were elected."). Regardless, as noted above, a federal court cannot conclusively resolve a pure question of state law such as the one presented in this case.

to keep a state government going, has been held valid though the legislature is unconstitutionally apportioned. There isn't the same practical problem in holding void the legislators' attempt to continue themselves in their illegal state of unconstitutional apportionment."), *rev'd on other grounds*, 431 F.2d 378 (10th Cir. 1970); *City of Chicago v. Reeves*, 220 Ill. 274, 288 (1906) ("The right to propose amendments to the Constitution is not the exercise of legislative power by the General Assembly in its ordinary sense . . . .").

¶ 51     Legislative Defendants' second argument is that recognizing all legislators' authority to exercise all legislative powers even after *Covington* was decided is necessary to avoid "chaos and confusion." This argument relates to the basic justification for the de facto officer doctrine, which is to avoid the "[e]ndless confusion and expense [that] would ensue if the members of society were required to determine at their peril the rightful authority of each person occupying a public office before they invoked or yielded to his official action." *In re Wingler*, 231 N.C. at 565–66. According to Legislative Defendants, retroactively examining a particular legislator's authority to exercise any power constitutionally assigned to the legislature would fundamentally destabilize North Carolina law. In their view, it would both call into question all the legislative acts enacted by legislators subsequently determined to be elected due to unconstitutional apportionment statutes—which, given North Carolina's history with gerrymandering, is potentially many acts—and engender

profound uncertainty whenever legislators elected in accordance with facially valid apportionment statutes attempt to exercise legislative powers.

¶ 52          This argument is compelling, to an extent. The de facto doctrine is indeed "indispensable to the prompt and proper dispatch of governmental affairs." *In re Wingler*, 231 N.C. at 565. Applying it here ensures that North Carolinians continue to be governed by a legislature that can continue to function. We agree with Legislative Defendants that, as a prudential matter, it would be intolerable to hold that the people of North Carolina were left without any body capable of exercising legislative authority in the aftermath of *Covington*.

¶ 53          But while the de facto officer doctrine is properly invoked to stave off the possibility of "[e]ndless confusion and expense," *id.*, it does not change the fact that individuals exercising the power of an office assumed that office through unlawful means. Reflexively applying the de facto officer doctrine runs the risk of degrading the importance of the constitutionally prescribed processes through which individuals assume governmental office, processes which structure and legitimize the delegation of the people's sovereign power to elected representatives. The de facto officer doctrine may be necessary "to ensure the orderly administration of government," *State v. Oren*, 160 Vt. 245, 247 (1993), but it also threatens principles of popular sovereignty and democratic self-rule by requiring the public to be bound by the actions of an individual who, under the theory and structure of government

adopted by the people of North Carolina in their constitution, lacked authority to legitimately exercise sovereign power.

¶ 54        As the United States Supreme Court long ago explained, courts should exercise "caution" when considering "claims which, if not founded in violence or in mere might, . . . refer us for their origin certainly not to regular unquestioned legal or political authority;" rather, "claims founded upon the acts of a government *de facto* must be sustained, if at all, by *the nature and character of such acts themselves.*" *United States v. Reynes*, 50 U.S. (9 How.) 127, 153 (1850) (emphasis added). If concern for the orderly administration of government requires us to apply the de facto officer doctrine to shield actions undertaken *after* it was established that certain legislators assumed office through legally deficient means, the constitution also requires us to closely scrutinize those actions in view of their "nature and character" to avoid requiring the people to be governed by individuals who lack a legitimate claim to rule.

¶ 55        Legislative Defendants' final argument is that there is no principled way to distinguish between the constitutional amendments plaintiff has challenged in this litigation and all the other legislative acts the challenged legislators undertook after *Covington* and before their terms expired. In their view, if the legislature lost its claim to represent the people's will, then it could not exercise *any* legislative authority consistent with the principles of popular sovereignty and democratic self-rule, and *all* actions undertaken by the legislature after *Covington* would be subject to retroactive

invalidation. In support of this argument, Legislative Defendants rely primarily on *Dawson v. Bomar*, in which the Sixth Circuit rejected a state prisoner's claim that a statute authorizing the death penalty for certain criminal offenses was void because the legislature that enacted the statute was unconstitutionally malapportioned. 322 F.2d at 447–48. In rejecting the prisoner's effort to have the death penalty statute— but not other statutes—nullified, the Sixth Circuit refused to draw a distinction between statutes addressing different subjects based upon "the Court's opinion as to the wisdom, morality, or appropriateness of such laws." *Id.* at 448.

¶ 56        The Sixth Circuit's interpretation of federal common law does not, of course, control this Court's interpretation and application of state law. Regardless, Legislative Defendants misread *Dawson*, which held only that in applying the de facto officer doctrine, courts should not draw distinctions between categories of *ordinary* statutes addressing different subjects based solely on judicial views of the relative importance of those subjects. *Dawson* says nothing about how courts should approach categorically different types of legislative acts.

¶ 57        To the extent that Legislative Defendants' reliance on *Dawson* also suggests that no justification besides judicial caprice exists to distinguish between ordinary statutes and bills proposing constitutional amendments, Legislative Defendants overlook that the North Carolina Constitution itself draws precisely this distinction. The North Carolina Constitution expressly reserves to the people the right to "alter[ ]

or abolish[ ] their Constitution and form of government." N.C. Const. Art. I, § 3. The legislature must satisfy different, heightened procedural requirements as part of that process, requirements that do not apply when the legislature enacts ordinary statutes. N.C. Const. art. XIII, § 4. Constitutional amendments, unlike ordinary statutes, have the potential to transform North Carolina's theory of government and restructure its political processes. Clearly, the distinction between constitutional amendments and ordinary statutes was not invented by the trial court in this case; it was established by the people themselves as inscribed in the North Carolina Constitution. We cannot, and need not, blind ourselves to the chaos that would ensue if a body composed of a substantial number of officeholders who assumed office in violation of the United States and North Carolina Constitutions was afforded free reign to initiate the process of transforming North Carolina's fundamental law.

¶ 58     In sum, Legislative Defendants' arguments persuade us that the legislature, writ large, did not entirely lack authority to exercise legislative powers—legislators elected due to unconstitutional racial gerrymandering did not, as plaintiff argues, lack any colorable claim to exercise the powers delegated to the legislature. Accordingly, actions undertaken by legislators post-*Covington* are presumptively valid as the actions of de facto officers. But we are unconvinced that recognizing the challenged legislators' status as de facto officers compels the conclusion that these legislators possessed the authority to initiate the process of amending the North

Carolina Constitution. As we have explained, the de facto officer doctrine is a creation of the common law, introduced for prudential and practical reasons in response to issues that arise when a putative officeholder exercises the powers of an office. *See, e.g.*, *Porter*, 272 N.C. at 467; *cf. Goral v. Dart*, 2020 IL 125085, ¶ 71 ("The *de facto* officer doctrine is a common-law equitable doctrine that confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment to office is deficient."). Although we agree with Legislative Defendants that the de facto officer doctrine applies in this case, we conclude that we must define its scope in view of the interests the doctrine was designed to advance and the relevant constitutional provisions and principles the amendment process implicates.

**E. The validity of Session Law 2018-119 and Session Law 2018-128.**

The unique circumstances giving rise to this dispute require us to apply the common law de facto officer doctrine and to refine its terms. It is correct that we have never applied the de facto officer doctrine to shield actions undertaken after the legal deficiency in a putative officeholder's claim to office has been conclusively established. But replacing legislators elected due to an unconstitutional racial gerrymander is a more complex and time-intensive process than replacing a single individual who is ineligible to hold a particular office. *Cf. People ex rel Duncan*, 294 N.C. at 717 (examining de facto officer doctrine in claim challenging actions of district court judge

who was too old to hold judicial office). Because remedying even a single unconstitutionally gerrymandered district may require altering the boundaries of numerous other districts—and because courts must evaluate many different interests and equities when considering how to remedy an unconstitutional gerrymander—it is almost inevitable that legislators elected as a result of unconstitutional gerrymandering will continue serving in office for some amount of time after the illegality of the districts they were elected from has been conclusively established. Even though the de facto officer doctrine has traditionally only applied to actions undertaken before an individual's claim to an office has been proven deficient, we believe the doctrine should be applied to legislators who remain in office even after it has been determined that they were elected due to unconstitutional gerrymandering.

¶ 60        It is also correct that, generally, the de facto officer doctrine has been understood to shield all the actions undertaken by a de facto officer, without concern for the subject matter or nature of the act. *See, e.g.*, *Hinson v. Britt*, 232 N.C. 379, 381 (1950) ("The acts of a *de facto* officer are valid in law in respect to the public, whom he represents, and to third persons, with whom he deals officially."). We agree that the core insight justifying the de facto officer doctrine—the need to avoid chaos and confusion—amply justifies shielding all ordinary legislative enactments from ex post facto collateral attack. With respect to ordinary legislation, application of the de facto officer doctrine is necessary to ensure the people of North Carolina are served by a

body empowered to respond to the urgent, complex challenges of the day. *See Burke*, 26 N.C. at 359–60 ("It is a settled principle that the acts of officers *de facto* are as effectual, as far as the rights of third persons or the public are concerned, as if they were officers de jure. The business of life could not go on, if it were not so."). Furthermore, the risk that ordinary legislation will undermine fundamental constitutional principles is limited—ordinary legislation must comport with the North Carolina Constitution and is subject to judicial review. *See Bayard v. Singleton*, 1 N.C. (1 Mart.) 5, 3 (Super. Ct. 1787). Ordinary legislation can be repealed (or not) by a simple majority of the legislators elected from new districts after an unconstitutional gerrymander is remedied.

By contrast, the same prudential considerations do not justify applying the de facto officer doctrine to completely shield proposed constitutional amendments from collateral review when some number of legislators who voted on the amendment had already been determined to lack de jure status. As described above, the North Carolina Constitution itself draws a distinction between ordinary legislation and legislation initiating the process of altering or abolishing North Carolina's fundamental law. N.C. Const. art. XIII, § 4. The constitution imposes heightened procedural requirements for enacting constitutional amendments precisely because the people did not wish to see their fundamental law altered or abolished in response to everyday exigencies. *See Knight*, 169 N.C. at 347 ("The Constitution is intended to

be permanent, and was adopted not only to meet conditions then existing, but for the future . . . . It is not an enemy to progress, but as it is the result of deliberate consideration and mature judgment, first expressed in convention, and then approved by the people, it is so framed that it cannot be changed in a day . . . ."). Preserving de facto legislators' authority to initiate the amendment process in all circumstances is not only unnecessary to achieve the doctrine's goal of preventing chaos and maintaining the orderly administration of government, but it is also contrary to the theory and structure of government enacted by the North Carolina Constitution.

¶ 62          Constitutional amendments can work dramatic changes to our system of government that cannot easily be revisited. The people's power to alter or abolish the North Carolina Constitution is limited only by the United States Constitution under the terms of the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2. Unlike ordinary legislation, a new constitutional amendment can fundamentally change or repudiate then-existing constitutional provisions and principles. *See Leandro v. State*, 346 N.C. 336, 352 (1997) ("It is axiomatic that the terms or requirements of a constitution cannot be in violation of the same constitution—a constitution cannot violate itself."). If a legislator's de facto authority is unlimited, legislators who do not lawfully represent the will of the people could exercise legislative powers to evade democratic accountability and entrench themselves and their chosen policies by redefining how the people's sovereign power is allocated and exercised.

¶ 63  For example, legislators could present a proposed amendment constitutionalizing a particular policy alongside another amendment providing that, going forward, the constitution can only be amended with the unanimous consent of all legislators and approval by a ninety-nine percent majority of voters. Legislators could present a proposed amendment overruling a judicial decision conclusively establishing that the districts they were elected from violated the North Carolina Constitution and extending their own terms in office. Legislators could present a proposed amendment targeting a group of citizens who had been unconstitutionally excluded from the democratic process with particular burdens or devaluing the voice of that same group of citizens in the political process. Again, the fact that these proposed amendments must subsequently garner approval from a majority of voters does not assure that an amendment is an expression of the people's will as defined under the North Carolina Constitution as it currently exists—while the people reserved for themselves the awesome power to fundamentally change North Carolina's theory of government and basic political structure, they also chose to involve the legislature in the amendment process in order to avoid allowing such profound changes to be effectuated by a potentially fleeting majority of voters at any single moment in time.

¶ 64  For these reasons, we believe the trial court was correct to draw a distinction between ordinary legislation on the one hand and legislation initiating the process of

amending the North Carolina Constitution on the other. Still, further inquiry is needed before invalidating a challenged constitutional amendment. Given the risk of confusion that may arise when a court retroactively examines a constitutional amendment that has recently been approved by a majority of North Carolina voters, a constitutional amendment enacted by a legislature composed of unconstitutionally elected members should only be invalidated when the threat to popular sovereignty and democratic self-rule is substantial. While the North Carolina Constitution demands that courts scrutinize legislation proposing constitutional amendments when the authority of legislators to do so is challenged, prudential considerations demand that courts exercise "this most important and delicate power of holding legislation invalid" only when doing so is clearly necessary. *Bickett v. State Tax Comm'n*, 177 N.C. 433, 433 (1919). A court must consider the following questions when determining whether to apply the de facto officer doctrine to uphold legislation proposing constitutional amendments enacted under these circumstances.

¶ 65    First, as a threshold matter, a court must consider whether the votes of legislators who were elected as a result of unconstitutional gerrymandering were potentially decisive. This inquiry is necessary because it is individual *legislators* whose claim to office is constitutionally deficient; the *legislature* as a whole has not lost its authority to exercise the people's sovereign power. When a sufficient number of legislators elected in a manner consistent with the constitution approve a bill, there

is little reason to doubt that the bill reflects the will of the people as expressed by individuals specifically and properly authorized to exercise the powers delegated to the legislature. Although we recognize that the overall composition of the legislature influences the actions of the legislature in ways other than a raw vote count—for example, the presence of any single legislator, lawfully elected or not, might shape the body's deliberative process and the terms of a debate—when there is no meaningful chance that a lawfully constituted body "would produce a different outcome, [courts should] apply the *de facto* officer doctrine and uphold the validity of the" challenged enactment. *Vroman v. City of Soldotna*, 111 P.3d 343, 349 (Alaska 2005).

¶ 66    In this case, there is no doubt that the votes of legislators elected as a result of unconstitutional gerrymandering—that is, those elected directly from unconstitutionally gerrymandered districts and those elected in districts that needed to be redrawn in order to implement a constitutionally compliant districting plan—could have been decisive in passing Session Laws 2018-119 and 2018-128. Approving a bill to present a constitutional amendment to the voters requires a supermajority of three-fifths, and Legislative Defendants do not challenge the trial court's finding that "[c]uring th[e] widespread and sweeping racial gerrymander required that over two-thirds of the North Carolina House and Senate districts be redrawn." It is indisputable that plaintiff will satisfy this threshold inquiry. Nonetheless, under

different circumstances—for example, if the bills proposing the amendments had passed by a margin larger than the number of legislators who were not de jure officers—no further inquiry would be required, and the prudential considerations justifying the de facto officer doctrine would require leaving the legislature's actions undisturbed.

¶ 67       However, when as in this case the unconstitutionally elected legislators were sufficient in number to be decisive in the vote on a bill proposing a constitutional amendment, three further factors must be examined to determine if a challenged constitutional amendment so gravely threatens principles of popular sovereignty and democratic self-rule as to require retroactive invalidation. Courts must consider whether there is a substantial risk that a challenged constitutional amendment will immunize legislators from democratic accountability going forward or perpetuate the ongoing exclusion of a category of voters from the political process. When either of these situations occur, a legislature that did not fully represent the people of North Carolina has sought to entrench itself by redefining who "the people" are and how they govern themselves–the legislature has attempted to legitimate and perpetuate an otherwise legally deficient claim to exercise the people's political power and, in the process, sought to preempt the people's capacity to reassert their will consistent with the terms of their fundamental law. Under these circumstances, judicial intervention is necessary in light of "the importance of giving effect to already stated expressions

of the popular will." *State ex rel. Cooper v. Caperton*, 196 W. Va. 208, 218 (1996).

¶ 68          In general, if a constitutional amendment does not immunize legislators from democratic accountability or perpetuate the ongoing exclusion of a category of voters, the risk of chaos and confusion arising from retroactively examining the validity of an act proposing a constitutional amendment outweighs the threat to constitutional principles that arises from allowing the amendments to remain in place.[7] Amendments that constitutionalize a particular policy choice, but do not alter the way the people's sovereign power is allocated, channeled, and exercised by the people's representatives, do not typically threaten principles of popular sovereignty and democratic self-rule. Although these policy choices will be more difficult to revoke than policy choices enacted through ordinary legislation, the people can choose to revisit these choices by engaging in the political processes they have already structured and adopted.

¶ 69          There is, however, one exception to this general rule: policy choices that intentionally discriminate against a particular category of citizens who were also discriminated against in the drawing of the districts from which the legislators who

---

[7] The likelihood that invalidating a challenged constitutional amendment will engender significant confusion varies depending on the circumstance. For example, the magnitude of the potential confusion will vary depending on whether the constitutional amendment has been implemented through enabling legislation that has already taken effect, whether the public has relied upon changes in the law introduced by the amendment, and whether there was a significant lapse in time between passage of the constitutional amendment and the successful challenge to the legislators' authority.

initiated the amendment process were elected. In this circumstance, principles of popular sovereignty and democratic self-rule are threatened because it is reasonable to presume that the initial diminishment of the political power of a group of citizens directly enabled the passage of an amendment that lawmakers responsive to that group would likely have opposed. Under our system of government, groups of citizens who do not constitute a majority of voters are, of course, bound by laws they personally oppose, but the legitimacy of those laws is predicated on "the operation of those political processes ordinarily to be relied upon to protect minorities." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 n.4 (1938). Requiring persons to be bound by a constitutional amendment which specifically targets a group to which they belong for disfavored treatment, and which was enacted by a legislature formed through a political process designed to deprive them of an equal voice, is repugnant to the principles of popular sovereignty and democratic self-rule. It is a form of tyranny that would engender the very "chaos" the de facto officer doctrine was designed to avoid.

¶ 70        Thus, when the votes of legislators elected due to an unconstitutional gerrymander could have been decisive in enacting a bill proposing a constitutional amendment, courts must assess whether there is a substantial risk that the challenged amendment will (1) immunize legislators from democratic accountability; (2) perpetuate the ongoing exclusion of a category of voters from the political process;

or (3) intentionally discriminate against a particular category of citizens who were also discriminated against in the political process leading to the legislators' election. If any of these factors are present, then the balance of equities requires the court to invalidate the challenged amendment. If these factors are not present—or if the legislators elected due to an unconstitutional gerrymander were not so numerous as to be potentially decisive in the vote to put a proposed amendment to the people—the challenged amendment must be left in place.

In this case, the trial court did enter some findings of fact that are relevant to these factors. Specifically, in addressing NC NAACP's standing to challenge the two amendments, the trial court found as follows:

> 31. Members of the NC NAACP, who include African-American and Latino voters in North Carolina, and the NAACP itself are directly harmed by the proposed Voter ID constitutional amendment. Members will be effectively denied the right to vote or otherwise deprived of meaningful access to the political process as a result of the proposed Voter ID requirement. The proposed Voter ID amendment will also impose costs and substantial and undue burdens on the right to vote for those and other members.
>
> . . . .
>
> 33. The income tax cap constitutional amendment harms the NC NAACP, its members, and the communities it serves, and its ability to advocate for its priority issues. Because the amendment places a flat, artificial limit on income taxes, it prohibits the state from establishing graduated tax rates on higher-income taxpayers and, over time, will act as a tax cut only for the wealthy. This tends

> to favor white households and disadvantage people of color,
> reinforcing the accumulation of wealth for white taxpayers
> and undermining the financing of public structures that
> have the potential to benefit non-wealthy people, including
> people of color and the poor. For example, historically in
> North Carolina, decreased revenue produced by income tax
> cuts in the state has resulted in significant spending cuts
> that disproportionately hurt public schools, eliminated or
> significantly reduced funding for communities of color, and
> otherwise undermined economic opportunity for the non-
> wealthy.

However, the trial court did not engage these factual questions in the context of a proper understanding of the law governing the novel legal question presented in this case, and the parties did not have the opportunity to present all evidence that may be relevant to resolution of this inquiry. Therefore, we reverse the decision of the Court of Appeals and remand to the trial court solely for an evidentiary hearing and the entry of additional findings of fact and conclusions of law addressing whether, in light of the factors identified in this opinion, the de facto officer doctrine should be applied to shield the acts proposing the Voter ID and / or Tax Cap Amendments from retroactive invalidation. On remand, the parties otherwise remain bound by the trial court's unchallenged findings of fact as contained in its prior order.

The dissent disagrees with our resolution of the novel legal issues presented in this case. Registering disagreement is, of course, the prerogative of dissenting Justices and the very purpose of a dissenting opinion. But the language the dissent chooses to register its disagreement goes well beyond language typically used to

express the kind of good-faith disputes about the thorny legal questions that inevitably arise when this Court is called upon to answer novel legal issues. In a caustic and unprecedented manner, the dissent suggests that our resolution of this case can only have resulted from pure partisan bias and intellectual dishonesty. This accusation is beneath the dignity of this Court. The suggestion that no neutral, honest jurist could possibly resolve this case differently than the way the dissent would have resolved it impugns the integrity of the federal judges who initially considered the issue raised in this appeal and determined it to implicate weighty and unsettled questions of state law, the trial court judge who ruled in plaintiff's favor, the dissenting Court of Appeals judge who disagreed with his colleagues' decision to reverse the Superior Court's order, and the many dedicated advocates who advanced nuanced and deeply-researched arguments in the course of these proceedings. Within our legal system, lawyers, judges, and Justices who endeavor to answer difficult legal questions arising from novel circumstances can reach different conclusions based on different interpretations of the relevant law and different understandings of the proper role of the judiciary. If the answers to these questions were easy, there would be no need for lawyers, judges, and Justices. To the extent the dissent advances a competing interpretation of the constitutional provisions and principles at issue in this case, we rest on the legal reasoning expressed in this opinion that led to the ultimate conclusion we arrived at; to the extent the dissent asserts that our ultimate

conclusion is driven by anything other than our best efforts to interpret and apply the relevant sources of legal authority, we reject the dissent's specious and unfounded accusation in the most forceful terms.

## IV.    Conclusion

¶ 73        "We should ever be mindful that the Constitution to a great extent is the rudder to keep the ship of state from off the rocks and reefs." *Hinton v. Lacy*, 193 N.C. 496 (1927). Although the questions raised in this appeal are novel, the answers can be found in the principles that are the foundation of North Carolina's system of government as expressed in multiple provisions of the North Carolina Constitution, the people's fundamental law. The people have reserved to themselves the power to amend or replace these principles and provisions. While they have assigned the legislature a role in the amendment process, the potentially transformative consequences of amendments that could change basic tenets of our constitutional system of government warrant heightened scrutiny of amendments enacted through a process that required the participation of legislators whose claim to represent the people's will has been disputed. Consistent with these constitutional principles and provisions, we conclude that acts proposing constitutional amendments passed by a legislature composed of a substantial number of legislators elected from unconstitutionally racially gerrymandered legislative districts, after the unlawfulness of those districts has been conclusively established, are not

automatically shielded by application of the de facto officer doctrine. We reverse the

decision of the Court of Appeals and instruct that court to remand this matter to the

trial court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Justice BERGER dissenting.

At issue today is not what our constitution says. The people of North Carolina settled that question when they amended the constitution to include the Voter ID and Tax Cap Amendments. These amendments were placed on the November 2018 ballot by the constitutionally required three-fifths majority in the legislature. On November 6, 2018, the citizens of North Carolina voted overwhelmingly to approve the North Carolina Voter ID Amendment and the North Carolina Income Tax Cap Amendment. More than 2,000,000 people, or 55.49% of voters, voted in favor of Voter ID, while the Tax Cap Amendment was approved by more than 57% of North Carolina's voters.[1]

Instead, the majority engages in an inquiry that is judicially forbidden — what *should* our constitution say? This question is designated solely to the people and the legislature. The majority concedes that constitutional procedures were followed, yet

---

[1] While only two amendments are the focus of plaintiffs' action, a total of six amendments were proposed to the people of North Carolina in November 2018. The additional amendment proposals were: Session Law 2018-96 (Protect the Right to Hunt, Fish, and Harvest Wildlife Amendment), Session Law 2018-110 (Strengthening Victims' Rights Amendment), Session Law 2018-117 (Legislative Appointments to Elections Board and Commissions Amendment), and Session Law 2018-118 (Judicial Selection for Midterm Vacancies Amendment). Session Laws 117 and 118 were the only two amendments not approved by voters.

they invalidate more than 4.1 million votes and disenfranchise more than 55% of North Carolina's electorate. Unwilling to accept the results of a procedurally sound election that enshrined the Voter ID and Tax Cap Amendments in our state constitution, the majority nullifies the will of the people and precludes governance by the majority. In so doing, my colleagues extend the reach of their judicial power beyond mere judicial review of actions under our constitution; instead, they have determined that certain provisions of the constitution itself are objectionable. [2]

¶ 76        The majority concludes that our constitution should not include Voter ID or a lower tax ceiling, claiming that the legislature lacked authority to perform a constitutionally designated duty and that the people of this State had no legal right to amend their constitution. Certainly, the majority cannot rightfully declare that there are, or have been, periods of time in which the people of North Carolina have lacked authority to amend their constitution. Such a reading would be contrary to N.C. Const. art. I, §§ 2, 3, and 36.

¶ 77        Voiding constitutional authority is far more egregious than picking and choosing which category of laws to invalidate. *See Dawson v. Bomar*, 322 F.2d 445, 448 (6th Cir. 1963) (declining to separate and void only certain legislation enacted by malapportioned legislature, as doing so would "circumvent legal principles in order

---

[2] While the case is technically being remanded to the trial court, the desired outcome is clear from the tone and required test announced today.

to substitute the Court's opinion as to the wisdom, morality, or appropriateness of such laws."). Striking at the very heart of our form of government, the majority unilaterally reassigns constitutional duties and declares that the will of the judges is superior to the will of the people of North Carolina. At what point does the seizure of popular sovereignty by this Court violate the federal constitution?

¶ 78 One could argue that this Court has circumvented the will of the people and subverted our republican form of government guaranteed in Article IV, Section 4 of the United States Constitution through its "systematic frustration of the will of a majority of the electorate of the State." *Lucas v. Forty-Fourth Gen. Assembly of State of Colo.*, 377 U.S. 713, 753–54, 84 S. Ct. 1459, 1483, 12 L. Ed. 2d 632 (1964) (Stewart, J., dissenting). In Federalist No. 39, James Madison stated that a republic is "a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their offices during pleasure, for a limited period, or during good behavior." The Federalist No. 39 at 194 (James Madison) (Gideon ed. 2001).[3] Anti-Federalist author Centinel stated that, in a

---

[3] Madison, in discussing Article IV Section 4 in Federalist 43, notes that

> [i]n a confederacy founded on republican principles, and composed of republican members, the superintending government ought clearly to possess authority to defend the system against aristocratic or monarchial innovations. . . .
> If the interposition of the general government should not be needed, the provision for such an event will

republican government, "the people are the sovereign, and their sense or opinion is the criterion of every public measure. When this ceases to be the case, the nature of the government is changed . . . ." Centinel Letter I, The Essential Antifederalist, p. 100.

¶ 79        Moreover, one could also argue that this Court has violated the Fourteenth Amendment. The assumption of popular sovereignty to the exclusion of the people implicates the most fundamental rights. "To the extent that a citizen's right to vote is debased, he is that much less a citizen." *Reynolds v. Sims*, 377 U.S. 533, 567, 84 S. Ct. 1362, 1384, 12 L. Ed. 2d 506 (1964). The United States Supreme Court has dealt extensively with various redistricting and apportionment actions taken by state legislatures. Moreover, actions by members of the executive branch are routinely the subject of Fourteenth Amendment inquiries. It cannot then be inconceivable that the action by members of this Court to unilaterally invalidate the votes of millions of

---

> be a harmless superfluity only in the Constitution. . . . As long, therefore, as the existing republican forms are continued by the States, they are guaranteed by the federal Constitution. Whenever the States may choose to substitute other republican forms, they have a right to do so, and to claim the federal guaranty for the latter. The only restriction imposed on them is, that they shall not exchange republican for antirepublican Constitutions; a restriction which, it is presumed, will hardly be considered as a grievance.

The Federalist No. 43 at 225 (James Madison) (Gideon ed. 2001).

citizens of this State, thereby wholly prohibiting the "free exercise and enjoyment of their right and privilege," violates the Constitution. *United States v. Mosley*, 238 U.S. 383, 385, 35 S. Ct. 904, 905, 59 L. Ed. 1355 (1915).

¶ 80          The question before this Court is a simple one: under the North Carolina Constitution, what is the authority of the legislature to perform constitutionally prescribed acts? The answer seems obvious — our legislature has the authority to act consistent with the terms of our state's constitution. Importantly, the Constitution of North Carolina is not a grant of power, but rather, a limitation; power not surrendered remains with the people and is exercised through the General Assembly, which functions as the arm of the electorate. *Pope v. Easley*, 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (per curiam); *Sugar Creek Charter Sch., Inc. v. State*, 214 N.C. App. 1, 18, 712 S.E.2d 730, 741 (2011), *appeal dismissed and disc. rev. denied*, 366 N.C. 227, 726 S.E.2d 849 (2012). "[U]nder the principle of popular sovereignty, the 'political power' of the people is channeled through the proper functioning of the democratic processes of our constitutional system to the people's representatives in government." *Harper v. Hall*, 380 N.C. 317, 370–71, 2022-NCSC-17, ¶ 130, 868 S.E.2d 499, 538–39, *cert. granted sub nom. Moore v. Harper*, 2022 WL 2347621 (U.S. June 30, 2022) (No. 21-1271); *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 612, 2021-NCSC-6, ¶ 92, 853 S.E.2d 698, 736 (2021) (Newby, C.J., concurring) ("[T]he sovereign power resides with the people and is

exercised by their representatives in the General Assembly." (alteration in original) (quoting *State ex rel. Ewart v. Jones*, 116 N.C. 570, 570, 21 S.E. 787, 787 (1895)). It follows then that courts are not to look to the constitution of our state to determine whether the people, via the legislature, are authorized to act, but only to see if such action is prohibited.

¶ 81    More than eighty years ago in *Leonard v. Maxwell*, 216 N.C. 89, 3 S.E.2d 316 (1939), this Court rejected as nonjusticiable the same argument plaintiffs' ask us to address today. Specifically, this Court declined to interject itself in such a dispute, and we noted that the General Assembly's knowing failure to abide by constitutional directives in apportionment did not prevent the legislature from performing constitutional functions designated exclusively to that branch. *Id.* at 98–99, 3 S.E.2d at 324.

¶ 82    The majority, however, eschews clear precedent and abandons constitutional order to remove the Voter ID and Tax Cap Amendments from our constitution, instead imposing its policy preferences on the people of North Carolina. As the Court of Appeals correctly stated, "overwhelming, if not universal, authority" runs counter to the Court's decision today. *N. C. State Conf. of NAACP v. Moore*, 273 N.C. App. 452, 461, 849 S.E.2d 87, 94 (2020).

¶ 83    My colleagues confess that they must "refine" precedent to achieve their result. What the majority is actually saying is that inclusion of the Voter ID and Tax Cap

Amendments in our constitution is not acceptable, so they disguise radical arguments as judicial reasoning to justify their political outcome.

¶ 84        As Justice Benjamin Curtis noted in his famous dissent:

> Political reasons have not the requisite certainty to afford rules of juridical interpretation. They are different in different men. They are different in the same men at different times. And when a strict interpretation of the Constitution, according to the fixed rules which govern the interpretation of laws, is abandoned, and the theoretical opinions of individuals are allowed to control its meaning, we have no longer a Constitution; we are under the government of individual men, who for the time being have power to declare what the Constitution is, according to their own views of what it ought to mean. When such a method of interpretation of the Constitution obtains, in place of a republican Government, with limited and defined powers, we have a Government which is merely an exponent of the . . . individual political opinions of the members of this court.

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 620–21, 15 L. Ed. 691 (1857), *superseded by Constitutional Amendment*, U.S. Const. amends. XIII, XIV. (1868) (Curtis, J., dissenting). Such is the case here.

¶ 85        "[T]he people . . . are the fountain of all power, to whom alone it of right belongs to make or unmake constitutions or forms of government at their pleasure." Brutus, Essay I, *The Essential Antifederalist* 106. Our state constitution recognizes this fundamental principle that all political power ultimately resides in the people. N.C. Const. art. I, § 2. The North Carolina Constitution guarantees that "[t]he people of

this State have the inherent, sole, and exclusive right of regulating the internal government and police thereof, and of altering or abolishing their Constitution and form of government whenever it may be necessary to their safety and happiness[.]" *Id*. art. I, § 3*; see also Dickson v. Rucho*, 366 N.C. 332, 344–45, 737 S.E.2d 362, 371 (2013). This provision reflects the right of the people to organize their government for the protection of fundamental rights; relevant here, the right to vote in fair elections and the right to enjoy the fruits of one's own labor free from oppressive taxation. These rights are manifestations of the "principles of popular sovereignty and democratic self-rule." Seizure of this power from the people runs counter to the very ideals upon which our government is predicated.

¶ 86      It is ironic that the majority finds the ultimate safeguard for the will of the people to be four individuals on this Court, not the more than 4.1 million votes cast for the Voter ID and Tax Cap Amendments. The gatekeeping function for inclusion of any such proposals into our constitution rests solely with the people and the political process, not this Court. Because "the people of North Carolina never intended to give this power to the judges," *State ex rel. Abbott v. Beddingfield*, 125 N.C. 256, 269, 34 S.E. 412, 422–23 (1899) (Clark, J., dissenting), I respectfully dissent.

## I. Justiciability

¶ 87    "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803); *see also Bayard v. Singleton*, 1 N.C. (1 Mart.) 5 (Super. Ct. L. & Eq. 1787). Courts are limited to answering questions that are "historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95, 88 S. Ct. 1942, 1950, 20 L. Ed. 2d 947 (1968). "Sometimes, however, 'the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights.' " *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494, 204 L. Ed. 2d 931 (2019) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 277, 124 S. Ct. 1769, 1776, 158 L. Ed. 2d 546 (2004) (plurality opinion)).

¶ 88    Certain claims, like the one at issue today, cannot be judicially entertained as they present a nonjusticiable political question. *See Harper v. Hall*, 380 N.C. at 413, 2022-NCSC-17, ¶ 237, 868 S.E.2d at 566 (Newby, C.J., dissenting) ("[C]ourts must refuse to review issues that are better suited for the political branches; these issues are nonjusticiable."); *accord Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962) (emphasizing that courts must not involve themselves in "policy determination[s] of a kind clearly for nonjudicial discretion"); *see also Bacon v. Lee*, 353 N.C. 696, 716–17, 549 S.E.2d 840, 854 (2001); *Hoke Cnty. Bd. of Educ. v. State*, 358 N.C. 605, 639, 599 S.E.2d 365, 391 (2004). Claims introducing a political question

are said to be "outside the courts' competence and therefore beyond the courts' jurisdiction." *Rucho*, 139 S. Ct. at 2494, 204 L. Ed. 2d at 931 (2019).

¶ 89     At its root, a question is political in nature if it invokes an issue that (1) showcases "a textually demonstrable constitutional commitment of the issue to a coordinate political department," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195, 132 S. Ct. 1421, 1427, 182 L. Ed. 2d 423 (2012) (quoting *Nixon v. United States*, 506 U.S. 224, 228, 113 S. Ct. 732, 735, 122 L. Ed. 2d 1 (1993)), or (2) results in "policy choices and value determinations." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230, 106 S. Ct. 2860, 2866, 92 L. Ed. 2d 166 (1986).  The foundational purpose of this doctrine is to prevent the judiciary from entering political disputes and undertaking questions of policy that are constitutionally committed to the other branches and better resolved by the people and their representatives.[4]

¶ 90     Our constitution instructs that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other."  N.C. Const. art. I, §6; John V. Orth & Paul M. Newby, The North Carolina State Constitution 50 (G. Alan. Tarr ed., 2d ed. 2013) [hereinafter, Orth,

---

[4] Some legal observers are critical of the purported politicization of the judiciary across the country.  One could argue that the failure to follow the political question doctrine is a chief reason judges are perceived as being increasingly political.  Quite simply, there are some pools we should not swim in.  Unfortunately, judicial restraint yields to the excitement with which some judges approach the opportunity to make the law, or here, to remake our constitution.

N.C. State Const.]. ("In the exercise of their right to regulate the state's internal government, North Carolinians separated political power into its constituent parts: legislative, executive, and judicial."). Indeed, "the separation of powers doctrine is well established under North Carolina law." *Cooper v. Berger (Cooper II),* 376 N.C. 22, 44, 852 S.E. 2d 46, 63 (2020) (quoting *Bacon*, 353 N.C. at 715, 549 S.E.2d at 853). The independent exercise of each department is "[t]he very genius of our tripartite government." *In re Dist. Ct. Admin. Ord.*, 365 N.C. 417, 417, 721 S.E.2d 225, 225 (2012) (per curiam order) (quoting *In re Alamance Cnty. Ct. Facilities*, 329 N.C. 84, 99–100, 405 S.E.2d 125, 133 (1991)). Built into this genius is a necessary prohibition against one branch of government preventing another from executing its primary duties. *Cooper v. Berger (Cooper I),* 370 N.C. 392, 410, 809 S.E.2d 98, 108 (2018); *see also Dickson*, 366 N.C. at 345, 737 S.E.2d at 371 ("[T]he fundamental law" ensures the inherent right of the General Assembly to fulfill its responsibilities "without interference by any other department of the government." (cleaned up)); *Person v. Doughton*, 186 N.C. 723, 725, 120 S.E. 481, 482–23 (1923) ("The courts have no direct supervisory power over the Legislature. The two are separate and distinct, though co-ordinate branches of the same government."). Failure to adhere to such principles results in a violation of "a cornerstone of our state and federal governments." *State ex rel. McCrory v. Berger*, 368 N.C. 633, 649, 781 S.E.2d 248, 258 (2016) (citing *State ex rel. Wallace v. Bone*, 304 N.C. 591, 601, 286 S.E.2d 79, 84 (1982)).

¶ 91        The doctrine operates to constrain judicial action, and our nation's highest court has "identif[ied] [justiciability] as essentially a function of [ ] separation of powers." *Baker*, 369 U.S. at 217, 82 S. Ct. at 710, 7 L.Ed.2d 663. This Court has recognized that "the Constitution of North Carolina includes an express separation of powers provision." *Bacon*, 353 N.C. at 716, 549 S.E.2d at 853–54 (emphasis omitted). "Judicial review of a political question itself violates separation of powers because the Court asserts a power it does not have to prevent the exercise of a specific power held by a political branch." *Cooper I*, 370 N.C. at 434–35, 809 S.E.2d at 124 (Newby, J., dissenting.).

¶ 92        By the plain text of our constitution, the legislature alone is granted the power to propose amendments to the constitution. N.C. Const. art. XIII, § 4; *see id.*, art I, § 6. Our constitution provides that:

> [a] proposal of a new or revised Constitution or an amendment or amendments to this Constitution may be initiated by the General Assembly, but only if three-fifths of all the members of each house shall adopt an act submitting the proposal to the qualified voters of the State for their ratification or rejection. The proposal shall be submitted at the time and in the manner prescribed by the General Assembly.

*Id.*, art. XIII, § 4. In addition, legislative initiation must follow the following procedure:

> (2) Every bill proposing a new or revised Constitution or an amendment or amendments to this Constitution or calling

74

> a convention of the people of this State, and containing no
> other matter, shall be submitted to the qualified voters of
> this State after it shall have been read three times in each
> house and signed by the presiding officers of both houses.

*Id.*, art. II, § 22(2). If the required majority of each house of the legislature favorably

vote on a constitutional proposal or proposals, "it or they shall become effective

January first next after ratification by the voters unless a different effective date is

prescribed in the act submitting the proposal or proposals to the qualified voters." *Id.*,

art. XIII, § 4.[5]

¶ 93    Despite stating multiple times in its opinion that the legislature initiates the

process of amending the state constitution, the majority inexplicably concludes that

"[l]egislative [d]efendants have failed to demonstrate that" Article XIII presents a

textually demonstrable constitutional commitment of the issue to the sole discretion

of a coordinate branch of government. This simply strains credibility. If initiation of

the amendment process is not constitutionally committed to the General Assembly,

the majority declines to answer the glaring question—who possesses that authority?

¶ 94    As we have found in other instances involving a "textually demonstrable

constitutional commitment of the issue to a coordinate political department," "judicial

review of the exercise of [legislative amendment] power would unreasonably disrupt

a core power of the [legislature]." *Bacon*, 353 N.C. at 717, 549 S.E.2d at 854 (quoting

---

[5] In addition to legislative initiation, constitutional amendments may be proposed by a "Convention of the People." N.C. Const. art. XIII, § 3.

*Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 710, 7 L. Ed. 2d 663, 686 (1962)). Only express constitutional provisions act to limit the powers of another branch of government, and absent such provisions in the constitution itself, this Court presumes valid legislative power. *State ex rel. Martin v. Preston,* 325 N.C. 438, 448–49, 385 S.E.2d 473, 478 (1989); *e.g., Hart v. State,* 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015). The majority's signal that it must "examine the constitutional provisions to determine if those provisions limit the authority" of the 2018 General Assembly is a question not proper for consideration as the amendment process is wholly within the province of our legislature. *See* N.C. Const. art. XIII, § 4.

¶ 95        The majority also seems to suggest that the legislature was *unqualified* to act. Indeed, the majority identifies the sole question before it as "whether the legislators who passed the bills submitting these two amendments to the voters could validly exercise the[ir] authority."

¶ 96        The legislature alone is textually granted the power to determine the qualifications of its members. N.C. Const. art. II, § 20. The judiciary does not and has never had the ability to judge a legislator's qualifications, until now. *See State ex rel. Alexander v. Pharr*, 179 N.C. 699, 699, 103 S.E. 8, 8 (1920) ("This Court is without jurisdiction, because the action is to try the title to a seat in the General Assembly of North Carolina, and the Constitution . . . provides, 'Each house (of the General Assembly) shall be judge of the qualifications and elections of its own

members,' thereby withdrawing [such] inquiry from the consideration of the courts." (quoting N.C. Const. of 1868, art. II, § 22)); *see also Nixon v. U.S.*, 506 U.S. 224 (1993) (As the U.S. Constitution expressly grants the Senate the sole power to try impeachments, the Court could not review whether a Senate impeachment rule violated the U.S. Constitution. Thus, the question was nonjusticiable.).

¶ 97        Additionally, the instant case raises a political question that forces this court to make value determinations and policy choices. "The General Assembly is the 'policy-making agency' because it is a far more appropriate forum than the courts for implementing policy-based changes to our laws." *Cooper I*, 370 N.C. at 429–30, 809 S.E.2d at 121 (Newby, J., dissenting) (quoting *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169, 594 S.E.2d 1, 8 (2004)); *see Lexington Insulation Co. v. Davidson County*, 243 N.C. 252, 254, 90 S.E.2d 496, 497 (1955); *see also Wachovia Bank & Tr. Co. v. Green*, 236 N.C. 654, 659, 73 S.E.2d 879, 883 (1953) ("The public policy of the state is a matter for the legislative branch of government and not for the courts."). To ensure this, the legislature is guaranteed "the inherent right to discharge its functions and to regulate its internal concerns in accordance with law without interference by any other department of the government." *Dickson*, 366 N.C. at 345, 737 S.E.2d at 371 (quoting *Person v. Bd. of State Tax Comm'rs*, 184 N.C. 499, 503, 115 S.E. 336, 339 (1922)). Further, "respect for separation of powers requires a court to refrain from . . . making

a policy determination of a kind clearly suited for nonjudicial discretion." *Harper*,

380 N.C. at 413–414, 2022 NCSC 17, ¶ 237, 868 S.E.2d (Newby, C.J., dissenting).

This Court's decision in *Leonard v. Maxwell* illustrates the judiciary's

reluctance to tackle questions related to the authority of the legislature to exercise

constitutionally committed powers. There, presenting a nearly identical argument to

the one in the instant case, the plaintiff challenged legislation enacted by an illegally

constituted General Assembly. Specifically, the plaintiff, a merchant, challenged an

audit completed under the Emergency Revenue Act of 1937 (the Act), seeking to have

the Act declared void by alleging, *inter alia*, that the 1937 General Assembly that

passed the Act was unconstitutionally constituted based on the plain text of the North

Carolina Constitution.

At the time, the last census had occurred in 1930, so the General Assembly was

required to reapportion legislative districts during its first session following the 1930

census. *See Leonard*, 216 N.C. at 98, 3 S.E.2d at 324. Because the legislature failed

to follow express constitutional directives, the plaintiff argued that the 1937 General

Assembly was unconstitutionally constituted, and the Act, therefore, was not validly

enacted. *See id.* at 98, 3 S.E.2d at 324. This Court summarized this argument as

follows:

> The third ground upon which the plaintiff assails the
> validity of the act is, that the General Assembly of 1937
> was not properly constituted because no reapportionment
> was made at the first session after the last census as

required by Art. II, secs. 4, 5, and 6 of the Constitution, and
that *none of the legislation attempted at this session can be
regarded as possessing the sanctity of law*.

*Id.*, at 98, 3 S.E.2d at 324 (emphasis added)

¶ 100      In response, despite the fact that the General Assembly knowingly ignored a
clear constitutional directive, the defendant in *Leonard* cited several cases from other
states repudiating the plaintiff's argument and holding that even when the
legislature is elected under decidedly malapportioned maps, it continues to possess
the full extent of its legislative powers. As an example, the defendant pointed to
*People v. Clardy*, in which a criminal defendant unsuccessfully argued that the
statute under which he was indicted was "unconstitutional and void for the reason
that the Constitution required a reapportionment of the General Assembly after each
Federal census, which had not been done" and thus the legislature "had no legal
existence." *See* Defendant Appellee's Brief at 4, *Leonard*, 216 N.C. 89 (No. 744) (citing
*People v. Clardy*, 334 Ill. 160, 161–62, 165 N.E. 638, 638–39 (1929)). The Illinois
Supreme Court rejected this argument as meritless because their state constitution
could not be read to punish citizens by forfeiture of popular sovereignty for failure of
the legislature to reapportion.  *Clardy*, 334 Ill. at 167, 165 N.E. at 640–41.  In
addition, the court determined that the failure of prior legislatures to properly
reapportion does not prevent subsequent members of the legislature from holding

79

office. *Id*. at 167, 165 N.E. at 640. Ultimately, the Illinois Supreme Court held that it was "not authorized by the Constitution of Illinois to declare that the General Assembly that passed the [ ] Act [ ] was not a de jure legislative body and the members thereof de jure members and officers of that General Assembly." *Id*. at 167, 165 N.E. at 640–41.

¶ 101    Plaintiffs in the current case make the same arguments presented in *Leonard*. The *Leonard* Court posited that—when taken to its logical conclusion—the plaintiff's argument meant that

> [if] the first session of the General Assembly after the 1930 census was the session directed by the Constitution to make the reapportionment, and [the General Assembly] failed to do so, it is suggested that no other session is competent to make the reapportionment *or to enact any valid legislation* and that henceforth no *de jure* or legally constituted General Assembly can again be convened under the present Constitution.

*Leonard,* 216 N.C. at 98–99, 3 S.E.2d at 324 (emphasis added). In other words, the plaintiff's argument required the conclusion that the 1937 General Assembly lacked not only the authority to pass legislation, but lacked all power constitutionally committed to the legislative branch.

¶ 102    This Court concluded that such was "[q]uite a devastating argument, if sound." *Id*. at 99, 3 S.E.2d at 324. Accordingly, we determined that the plaintiff's questioning of legislative authority posed a nonjusticiable political question. *Id*. at 99, 3 S.E.2d at 324. ("The question is a political one, and there is nothing the courts can do about

it . . . . They do not cruise in nonjusticiable waters." (cleaned up)).

¶ 103    In reaching this conclusion, this Court cited another Illinois case from the defendant's brief, *People ex rel. Fergus v. Blackwell*, in which Illinois voters instituted a *quo warranto* action against the members of the Fifty-Sixth Illinois General Assembly.  342 Ill. 223, 223–24, 173 N.E. 750, 751 (1930).  In *Fergus* the plaintiffs asserted that:

> every General Assembly since 1911, including the [current] General Assembly, had failed to reapportion the state into districts on the basis of population, as required by section 6 of article 4 of the Constitution of 1870, and that every General Assembly since 1911, including the [current one] . . . was illegal, unconstitutional, and void, and that the defendants are therefore not eligible and qualified to act as members of the General Assembly to represent the respective districts for which they were elected.

*Id.* at 224, 173 N.E. at 751.

¶ 104    The Illinois Supreme Court declined to address the scope of the Illinois General Assembly's authority:

> We have held that this court has no power, under the Constitution, to compel the Legislature to reapportion the state, as required by the Constitution. What this court cannot do directly in this respect it cannot do indirectly. The sole basis for the present proceeding is the claim that, because of the failure of the Legislature to make the necessary reapportionment, no General Assembly since 1911 has had any *de jure* existence or validity. . . . On appellants' theory, neither the Legislature as now composed nor any succeeding Legislature elected prior to a new reapportionment of the state would be a de jure body. It would therefore be impossible for the present or any

81

succeeding Legislature to reapportion the state, since, on the theory of this proceeding, there could be no de jure Legislature until after a reapportionment has been made. But, since re-apportionment can be made only by the Legislature, *it is apparent that on appellants' theory, which is the foundation of this proceeding, reapportionment can never be made.* Moreover, on the same theory, all laws enacted since 1911 would be invalid and no new laws could be enacted. . . . The matters complained of are solely within the province of the General Assembly, and the courts have no power to coerce or direct its action.

*Id.* at 225–26, 173 N.E. at 751–52 (emphasis added) (citations omitted).

¶ 105 Our Court in *Leonard* looked to such support in holding that the question of whether the Act was void, based on a lack of legitimate legislative authority, was nonjusticiable. *See Leonard*, 216 N.C. at 98–99, 3 S.E.2d at 324. The Court in *Leonard* accepted that the legislature failed to engage in reapportionment following the 1930 census, yet wholly rejected the argument [as non-justiciable] that the legislature lacked authority to engage in constitutionally committed functions.[6] The Court reasoned that precedent was against such a determination. *Id.* at 98–99, 3 S.E.2d at 324.

¶ 106 This Court in *Leonard* did not reach its conclusion because the issue of *apportionment* was a political question, as the majority here claims. To be clear, the plaintiff in *Leonard* was not asking the Court to order reapportionment of the 1930

---

[6] Contrary to the majority's dismissive analysis concerning de jure authority to act discussed further below, *Leonard* suggests that the malapportioned General Assembly had de jure authority.

legislature. Rather, the plaintiff contended that the invalidity of the malapportioned legislature limited the power of that body. The Court in *Leonard* recognized, however, that it was not constitutionally authorized to review such an issue. Here, according to the majority's revisionist view, however, *Leonard* presented the limited question of whether "the General Assembly's failure to reapportion itself during the first regular session after the decennial census meant that there could never be a legitimately constituted General Assembly unless and until the North Carolina Constitution was amended to provide for another manner of reapportionment." This was *not* the question that was before the *Leonard* Court—it was simply part of the legal reasoning used by this Court in determining that the issue in *Leonard* was nonjusticiable.

¶ 107    Taken to its logical end, the plaintiff's argument in *Leonard*, if accepted by this Court, would have resulted in a powerless legislature. Additionally, all legislation passed by the subsequent sitting General Assemblies of 1932, 1934, 1936, 1938, and 1940 would have lacked the "sanctity of law." *Id.* at 98, 3 S.E.2d. at 324. Over the span of these years affected by malapportionment, the General Assembly proposed nine constitutional amendments to the people of North Carolina, ranging in subject matter from, ironically, increasing the maximum income tax rate to establishing the

Department of Education, and even enlarging the number of justices on this Court.[7]

North Carolina voters approved all nine amendments. *See* N.C. Sec'y State, *North Carolina Government 1585-1979*: *A Narrative and Statistical Analysis*, 920−27 (John L. Cheney, Jr. ed., 2d ed. 1981). Under the majority's reasoning in the current case, these amendments are potentially voidable.

---

[7] The 1935 General Assembly proposed five amendments that 1) authorized classification of property for purposes of taxation, 2) increased the maximum tax rate from six percent to ten percent, 3) limited the power of state and local governments to borrow money without a vote of the people, 4) authorized the General Assembly to enlarge the Supreme Court from five to seven members, and 5) authorized the General Assembly to exempt up to $1,000 in value of property held in a homestead from taxation. *See* An Act to Amend the Constitution to Permit Classification of Property for Taxation, Encouragement of Home Ownership, to Increase the Limit for Income Taxation and to Limit the Power of State and Local Government to Borrow Money Without a Vote of the People, ch. 248, §§ 1−3, 1935 N.C. Pub. [Sess.] Laws 270, 270−71; An Act to Amend Section Six of Article Four of the Constitution of North Carolina Relating to the Supreme Court, and to Amend Section Five of Article Five of the Constitution of North Carolina Authorizing the General Assembly to Pass Laws Exempting From Taxation Not Exceeding One Thousand Dollars ($1,000.00) in Value of Property Held and Used as Place of Residence of the Owner, ch. 444, §§ 1−2, 1935 N.C. Pub. [Sess.] Laws 745, 745.

In 1937 the General Assembly proposed two more amendments—one increasing the term of sheriffs and coroners from two years to four years and one authorizing the General Assembly to establish the Department of Justice. *See* An Act to Amend Section Twenty-Four of Article Four of the Constitution of North Carolina Relative to Sheriffs, ch. 241, § 1, 1937 N.C. Pub. [Sess.] Laws 457, 457; An Act to Amend the Constitution to Permit the General Assembly to Create a Department of Justice in Order to Secure the Uniform and Adequate Administration of the Criminal Laws of the State, ch. 447, § 1, 1937 N.C. Pub. [Sess.] Laws, 908, 908.

Finally, the General Assembly of 1941 proposed two constitutional amendments. One created and organized the State Board of Education, and the other provided for twenty-one solicitorial districts through the State. *See* An Act to Amend the Constitution Providing for the Organization of the State Board of Education and the Powers and Duties of the Same, ch. 151 §§ 1−3, 1941 N.C. Pub. [Sess.] Laws, 240, 240−41; An Act to Amend Section Twenty-Three of Article Four of the Constitution of North Carolina, Relating to Solicitors, ch. 261, § 1, 1941 N.C. Pub. [Sess.] Laws 376, 376.

¶ 108        Despite acknowledging that *Leonard* similarly involved validity of an action by a malapportioned legislature, the majority further disregards *Leonard*, claiming its applicability is limited because *Baker v. Carr* is more instructive and that the issue in *Leonard* was not completely "analogous to the claim presented in this case." Curiously, however, and despite noting that "the claim at issue in this case is not a claim that the General Assembly is unconstitutionally apportioned," the majority chooses to take guidance from a case that solely deals with reapportionment, i.e., *Baker*, rather than from a decision of this Court which is directly on point. *See Leonard*.

¶ 109        The majority's dismissal of our precedent here is deeply troublesome, yet increasingly unsurprising. Nothing in *Baker*[8] operates to change the analysis this Court applied in *Leonard*, and the majority's refusal to follow this Court's previous decision has no jurisprudential explanation.

¶ 110        In addition, the new test devised by the majority not only raises political question concerns, but it requires policy choices. While the majority assures us that nothing "convert[s] plaintiff's claim into one that requires us to make 'policy choices and value determinations,' " these are hollow words. The fact that the majority's

---

[8] Making the majority's reliance on such even more interesting, *Baker* offers a proposition in direct conflict with the majority's position: "a legislature, though elected under an unfair apportionment scheme, is nonetheless a legislature empowered to act . . . ." *Baker v. Carr*, 369 U.S. at 250 n.5, 82 S. Ct. at 727 n.5, 7 L. Ed. 2d 663 (1962) (Douglas, J., concurring).

chosen remedy is an ideational test *calling for* policy choices and value determinations clues one into the political nature of the question at hand.

¶ 111    Based on this test, we must look at the legislature to "consider whether the votes of legislators who were elected as a result of unconstitutional gerrymandering were potentially decisive." If there is "no meaningful chance that a lawfully constituted body 'would produce a different outcome,' " legislative action is presumptively valid under the de facto officer doctrine. However, if there is a chance a different outcome could result, courts must inspect each legislative action to consider whether the enacted constitutional amendment "threatens principles of popular sovereignty and democratic self-rule." The majority orders the lower court to discern whether an amendment "will immunize legislators from democratic accountability," "perpetuate the ongoing exclusion of a category of voters from the political process," or "intentionally discriminate against a particular category of citizens who were also discriminated against in the political process leading to the legislators' election." "If any of these factors are present," the majority goes on to say, a court must "invalidate the challenged amendment."

¶ 112    How do we know if there is a chance for a different outcome? What data should the lower courts utilize to make this determination? Is the majority suggesting that votes in the legislature are, or should be, monolithic? How would the Tax Cap Amendment immunize legislators from democratic accountability, perpetuate the

continued exclusion of a category of voters, or constitute intentional discrimination?[9]

Or, does this test only apply to Voter ID?[10]

¶ 113          Determining which laws would be valid based on the majority's newly created test would inherently require courts to look into the substance of each legislative action and weigh the policy implications of those actions. Without an express provision in our constitution on such an issue, the majority here uses its self-defined terms of "democratic self-rule" and "popular sovereignty" as an "unrestricted license to judicially amend our constitution." *Harper v. Hall*, 380 N.C. at 421, 2022-NCSC-17, ¶ 244, 868 S.E.2d at 570 (Newby, C.J., dissenting). The majority's test "inherently

---

[9] To the extent that one would believe that a tax cap falls into this third category, studies in other states suggest the opposite. *See* Leah Byers, *The Effects of Georgia's 6 Percent Income Tax Cap* (2018), https://www.nccivitas.org/2018/effects-georgias-6-percent-income-tax-cap/ (finding that following the 2014 ratification of a 6% income cap amendment by Georgia voters, subsequent years showed (1) an increase in education spending by $2.5 billion from fiscal years 2014 to 2019 (Georgia Budget and Policy Institute, July 1, 2018 (citing Georgia Department of Instruction and Georgia's 2019 Fiscal Year Budget (HB 684)); and (2) the state's high bond rating, which has been maintained for almost 20 years (Gov. Kemp: Georgia Secures AAA Bond Rating in 2022, June 13, 2022) (https://gov.georgia.gov/press-releases/2022-06-13/gov-kemp-georgia-secures-aaa-bond-rating-2022).

[10] The National Bureau of Economic Research released a nationwide study concluding that "[s]trict ID laws' overall effects [on minority voter participation] do not increase over time, they remain close to zero and non-significant whether the election is a midterm or presidential election, and whether the laws are the more restrictive type that stipulate photo IDs." Enrico Cantoni & Vincent Pons, *Strict ID Laws Don't Stop Voters: Evidence from a U.S. Nationwide Panel, 2008-2018* 2 (NBER Working Paper No., 25522, 2021), https://www.nber.org/system/files/working_papers/w25522/w25522.pdf. Moreover, research found that strict ID laws have "no significant negative effect on registration or turnout, overall or for any subgroup defined by age, gender, race, or party affiliation." *Id.* at 1-2. Pertinent here, "strict ID requirements do not decrease the participation of ethnic minorities relative to whites." *Id.* at 2.
.

requires policy choices and value determinations and does not result in a neutral, manageable standard." *Id.* at 433–34, 2022-NCSC-17, ¶ 267, 868 S.E.2d at 577. This is true because the majority's decision is not rooted in the constitution but in political considerations.

¶ 114      Proposing amendments to our state constitution is a power clearly granted to the General Assembly. The majority here egregiously violates separation of powers, and, based on state and federal precedent, this case presents a nonjusticiable political question.

## II. De Facto and De Jure Authority

¶ 115      A governmental official either has the authority to act, or he does not. Consistent with this fact, well-established judicial doctrines have emerged. Specifically, courts have recognized instances in which governmental officials maintain the full power of their office, and other occasions when individuals attempt to occupy an office but have no power to act. The former may be either de jure or de facto officers; the latter are known as usurpers. None of these recognized legal distinctions, however, have ever limited or hybridized legislative power as the majority does here. Imagining its creation as the "best" for the situation at hand, the majority excises from legislative authority those actions it deems out of the "ordinary." To be sure, there is no legal basis for this judicial limitation on legislative authority, and the majority throws settled law into confusion.

¶ 116      "[A] legislature, though elected under an unfair apportionment scheme, is nonetheless a legislature empowered to act . . . ." *Baker v. Carr*, 369 U.S. at 250 n.5, 82 S. Ct at 727 n.5, 7 L. Ed. 2d 663 (Douglas, J., concurring); *see also  Buckley v. Valeo,* 424 U.S. 1, 142, 96 S.Ct. 612, 693, 46 L. Ed. 2d 659 (1976) (per curiam); *Ryder v. United States*, 515 U.S. 177, 180, 115 S. Ct. 2031, 2034, 132 L. Ed. 2d (1995); *Martin v. Henderson*, 289 F. Supp. 411, 414 (E.D. Tenn. 1967); *Everglades Drainage League v. Napoleon B. Broward Drainage Dist.*, 253 F. 246, 252 (S.D. Fla. 1918).

¶ 117      A de jure officer is one who has the legal right or title to the office.  *People ex rel. Duncan v. Beach*, 294 N.C. 713, 719–20, 242 S.E.2d 796, 800 (1978).  Essentially, an individual possessing de jure authority is one rightfully elected or otherwise appointed to the office he holds, who thus may exercise all rights and responsibility associated with that office. *See In re Wingler*, 231 N.C. 560, 563, 58 S.E.2d 372, 374 (1950).  North Carolina courts have never suggested that our General Assembly could not otherwise "continue exercising the powers granted to our state's legislative branch," *N. C. State Conf. of NAACP v. Moore*, 273 N.C. App. at 462, 849 S.E.2d at 94,  under de jure authority despite issues regarding malapportioned districts.  *See Pender County v. Bartlett*, 361 N.C. 491, 649 S.E.2d 364 (2007), *aff'd sub nom. Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct. 1231, 173 L. Ed. 2d 173 (2009).  Moreover, the legislature involved here was never judicially stripped of any authority. *Cf. Butterworth v. Dempsey*, 237 F. Supp. 302, 311 (D. Conn. 1964) (enjoining the

Connecticut legislature from passing any additional legislation unless reconstituted in constitutionally drawn districts). Accordingly, it appears that the 2018 General Assembly would be better classified as a legislature with de jure authority. *See Leonard*, 216 N.C. at 98–99, 3 S.E.2d at 324.

¶ 118 Even assuming, however, that the members of the 2018 General Assembly were not de jure officers, those legislators certainly possessed full de facto authority. "A *de facto* officer may be defined as one whose title is not good in law, but who is in fact in the unobstructed possession of an office and discharging its duties in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper." *Waite v. Santa Cruz*, 184 U.S. 302, 323, 22 S. Ct. 327, 334, 46 L. Ed 552 (1902). A de facto officer's official acts are categorically valid, even if that individual is found to lack de jure legal authority.

¶ 119 In application, the acts of a de facto officer are as concretely binding as those of a de jure officer. *See Phillips v. Payne*, 92 U.S. 130, 132, 23 L. Ed. 649 (1875) ("The acts of an officer *de facto*, within the sphere of the powers and duties of the office he assumes to hold, are as valid and binding with respect to the public and third persons as if they had been done by an officer *de jure*."); *Burke v. Elliott*, 26 N.C. (4 Ired.) 355, 359–60 (1844) ("[T]he acts of officers *de facto* are as effectual, as far as the rights of third persons or the public are concerned, as if they were officers *de jure*."); *Joseph v. Cawthorn*, 74 Ala. 411, 415 (1883) ("There is no distinction in law between the

official acts of an officer *de jure*, and those of an officer *de facto*. So far as the public and third persons are concerned, the acts of the one have precisely the same force and effect as the acts of the other."). The Supreme Court has described the rationale for not disturbing the official acts of de facto officers:

> The *de facto* officer doctrine confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient. The *de facto* doctrine springs from the fear of the chaos that would result from multiple and repetitious suits challenging every action taken by every official whose claim to office could be open to question, and seeks to protect the public by insuring the orderly functioning of the government despite technical defects in title to office.

*Ryder*, 515 U.S. at 180, 115 S. Ct. at 2034 (cleaned up). The power of de facto officers has been repeatedly affirmed both by the courts of this state and their federal counterparts.

¶ 120          Nothing in the de facto doctrine speaks of any limitation on authority. To the contrary, and ultimately to ensure stability, a de facto legislator enjoys the same scope of authority, and his or her actions the same validity, as a de jure legislator. *See In re Wingler*, 231 N.C. at 565, 58 S.E.2d at 376 ("The *de facto* doctrine is indispensable to the prompt and proper dispatch of governmental affairs.").

¶ 121          Courts are "not allowed to range so far afield as to hamstring state legislatures and deprive States of effective legislative government." *Fortson v. Toombs*, 379 U.S. 621, 625–26, 85 S. Ct. 598, 601, 13 L. Ed. 2d 527 (per curiam) (Harlan, J., concurring

91

in part and dissenting in part*), amended by* 380 U.S. 929, 85 S. Ct. 932, 13 L. Ed. 2d 819 (1965). Until today, no court, federal or state, has concluded that a legislative body which has de facto authority at a minimum should undergo individual ex post evaluations of constitutionally prescribed actions. Moreover, no court, federal or state, has excised individual legislative responsibilities after determining that legislators possess de facto authority, as the majority does here. In essence, the majority has so restricted legislative authority that it has effectively dissolved the legislature regarding its constitutionally defined role in proposing constitutional amendments.

¶ 122    Finally, when no de jure or de facto authority exists, an individual holding office is designated a usurper. "A usurper is one who undertakes to act officially without any actual or apparent authority. Since he is not an officer at all or for any purpose, his acts are absolutely void, and can be impeached at any time in any proceeding." *In re Wingler*, 231 N.C. at 564, 58 S.E.2d at 375 (citing *State v. Shuford*, 128 N.C. 588, 38 S.E. 808 (1901); *State ex rel. Van Amringe v. Taylor,* 108 N.C. 196, 12 S.E. 1005 (1891); *People ex rel. Norfleet v. Staton*, 73 N.C. 546, 21 Am.Rep. 479 (1875); *Keeler v. City of Newbern*, 61 N.C. 505 (1868)). This usurper category is the final of the three judicially recognized types of authority that one may possess.

¶ 123    The majority knows that its unprecedented approach has no basis in existing law. Understanding that the members were not usurpers, but unwilling to accept

that the de facto doctrine legitimizes *all* actions of the 2018 General Assembly, even those contested in the instant case, the majority claims that North Carolina's Constitution suddenly requires carving out a fourth category of authority. The reality is that well-established law is simply insufficient to reach the majority's desired result.

¶ 124     Indeed, the majority expressly acknowledges that members of the 2018 General Assembly were de facto legislators under the "belie[f] [that] the [de facto] doctrine should be applied to legislators who remain in office even after it has been determined they were elected pursuant to unconstitutional gerrymandering." Specifically, the majority refuses to accept plaintiff's argument that "the General Assembly . . . lack[ed] any colorable claim to exercise the powers delegated to the legislature," recognizing instead that the "actions undertaken by the legislators post-*Covington* are presumptively valid as the actions of de facto officers." However, the majority uses this as a pivot point to state that it cannot permit full approval of the acts of the 2018 General Assembly because doing so "require[es] the public to be bound by the actions of an individual who . . . lacked authority to legitimately exercise sovereign power."

¶ 125     To be sure, this is not a novel legal situation requiring the unprecedented actions by the majority. Courts have declared officers, including elected officials, to incorrectly hold office numerous times. These doctrines have been developed to

minimize any resulting chaos and to maintain order. *See EEOC v. Sears, Roebuck & Co.*, 650 F.2d 14, 17 (2d Cir. 1981) ("The de facto officer doctrine was developed to protect the public from the chaos and uncertainty that would ensue if actions taken by individuals apparently occupying government offices could later be invalidated by exposing defects in the officials' titles."). The majority's approach defeats the very purpose for which these doctrines on authority have developed.

¶ 126    Important here, and despite the majority's assertion to the contrary, the decision in *Covington* did nothing to disturb the authority of the 2018 legislature. Specifically, no action by any court tied the legislators' hands or truncated their terms of office. The decision in *Covington* to allow the 2018 General Assembly to remain in office is constitutionally significant. While it appears that the plaintiffs may have argued to the *Covington* court that the legislature's authority to act was an unsettled question of state law, article VI section 10 of our State's constitution instructs that "in the absence of any contrary provision, all officers in this State, whether appointed or elected, shall hold their positions until other appointments are made or, if the offices are elective, until their successors are chosen and qualified." N.C. Const. art. VI, § 10. This constitutional provision, in tandem with the decision in *Covington*, mandates that the 2018 General Assembly members "hold their offices" until replaced, with all commensurate authority attached. Thus, the question was not unsettled, just not fully explored.

94

Legislators in the 2018 General Assembly post-*Covington* continued in office to serve out the remainder of their terms. During that time, the General Assembly passed various pieces of legislation, from laws dealing with election integrity to those dealing with law enforcement stops. The General Assembly also proposed several constitutional amendments be brought before the people of this state for ratification. Operating pursuant to our state's constitution, each member of the General Assembly had the full authority to perform his or her duties. No restrictions were, or have been placed upon that body, until today. It would be nonsensical for a legislator at that time to believe that she, on the one hand, had the constitutional authority to vote on one piece of legislation, yet lacked the authority to vote on another bill; it is equally confounding for the majority to conclude as much.

At least until today, this Court has stressed that "[e]ndless confusion and expense would ensue if the members of society were required to determine at their peril the rightful authority of each person occupying a public office before they invoked or yielded to his official action." *In re Wingler*, 231 N.C. at 565–66, 58 S.Ed.2d at 376. Now, despite electing their legislators to office, North Carolinians are no longer able to trust that a legislator, or the legislature as a whole, has the requisite authority to act. And being that the legislature is merely a law-enacting agent of the true sovereign, i.e., the people, it is the authority of the people that is truly at risk.

¶ 129          This does not even begin to speak of the chaos and confusion that this case, and others like it, have caused.  The people of North Carolina understand that they approved the Voter ID and Tax Cap Amendments by overwhelming majorities.  Multiple lawsuits in state and federal courts seem to be the norm for politically charged issues.  The varied and inconsistent rulings from our courts only adds to the confusion surrounding the status of these provisions.  And this all stems, as stated above, from judges who are unwilling to engage in judicial restraint and yield to the political question doctrine.

¶ 130          Further contrary to the majority's assertion that this case presents "completely unprecedented circumstances," several examples from North Carolina's redistricting jurisprudence in which a General Assembly elected pursuant to malapportioned maps enacted legislation to propose a constitutional amendment are pertinent here.  In each of these cases, the invalidly constituted General Assembly was directed to redraw its maps while the invalidly elected legislators finished their respective terms.  In none of these cases did the court retroactively nullify acts of the malapportioned General Assembly or "impose limits" on the General Assembly's constitutionally committed legislative authority.  With this decision, the majority ignores these cases and creates an entirely new and unprecedented remedy.

¶ 131          Most notably, the majority ignores this Court's decision in *Pender County v. Bartlett*, in which we declared a legislative reapportionment plan unconstitutional

and then crafted an appropriate remedy. *See* 361 N.C. at 510, 649 S.E.2d at 376. In November 2003, the General Assembly enacted a plan to reapportion the House of Representatives (the 2003 House Plan). *See* An Act to Establish House Districts, Establish Senatorial Districts, and Make Changes to the Election Laws and to Other Laws Relating to Redistricting, S.L. 2003-434, §§ 1–2, 2003 N.C. Sess. Laws (1st Extra Sess. 2003) 1313, 1313–92. Five county commissioners challenged the 2003 House Plan as unconstitutional in violation of the Whole County Provision (WCP) of article II, section 5 of the North Carolina Constitution because the Plan divided Pender County among House Districts 16 and 18. *Pender County*, 361 N.C. at 495, 649 S.E.2d at 367. This Court held the division of Pender County between two districts violated the WCP. *Id.* at 493, 649 S.E.2d. at 366.

¶ 132        Having held the 2003 House Plan unconstitutional, we ordered the General Assembly to redraw the affected House districts to comply with the WCP. *Id.* at 510, 649 S.E.2d at 376. When our decision in *Pender County* was filed in August 2007, however, the unconstitutional 2003 House Plan had been used in both the 2004 and 2006 election cycles to elect legislators to the House of Representatives. N.C. Gen. Assembly, https://www.ncleg.gov/redistricting (last visited Aug. 14, 2022). Accordingly, our remedy required a General Assembly consisting of some number of unconstitutionally elected members to exercise its constitutional authority to "revise the representative districts and the apportionment of Representatives among those

97

districts." N.C. Const. art. II, § 5; *see Pender County*, 361 N.C. at 510, 649 S.E.2d at 376. We expressed no doubt that the General Assembly could exercise this authority, despite being elected under the unconstitutional plan.

¶ 133 Additionally, we chose to stay our order to redraw the House map until after the 2008 election cycle:

> We are cognizant that the General Assembly will need time to redistrict not only House District 18 but also other legislative districts directly and indirectly affected by this opinion. The North Carolina General Assembly is now in recess and is not scheduled to reconvene until 13 May 2008, after the closing of the period for filing for elective office in 2008. We also realize that candidates have been preparing for the 2008 election in reliance upon the districts as presently drawn. Accordingly, to minimize disruption to the ongoing election cycle, the remedy explained above shall be stayed until after the 2008 election. . . . At the conclusion of the 2008 election, House District 18 and other impacted districts must be redrawn.

*Pender County*, 361 N.C. at 510, 649 S.E.2d at 376 (citation omitted).

¶ 134 In determining it was appropriate to permit another election under the unconstitutional 2003 House Plan, we relied on guidance from one of the Supreme Court's landmark apportionment cases. *See id.* at 510, 649 S.E.2d at 376 (citing *Reynolds v. Sims*, 377 U.S. 533, 585, 84 S. Ct. 1362, 1394, 12 L. Ed. 2d 506 (1964)). In *Reynolds*, the Supreme Court held that Alabama's legislative reapportionment plans violated the Equal Protection Clause of the Fourteenth Amendment. 377 U.S.

at 568–70, 84 S. Ct. at 1384–86.  In addressing "proper remedial devices" in state

legislative apportionment cases, the Supreme Court explained that

> under certain circumstances, such as where an impending
> election is imminent and a State's election machinery is
> already in progress, equitable considerations might justify
> a court in withholding the granting of immediately
> effective relief in a legislative apportionment case, even
> though the existing apportionment scheme was found
> invalid. In awarding or withholding immediate relief, a
> court is entitled to and should consider the proximity of a
> forthcoming election and the mechanics and complexities
> of state election laws, and should act and rely upon general
> equitable principles. With respect to the timing of relief, a
> court can reasonably endeavor to avoid a disruption of the
> election process which might result from requiring
> precipitate changes that could make unreasonable or
> embarrassing demands on a State in adjusting to the
> requirements of the court's decree.

*Id.* at 585, 84 S. Ct. at 1393–1394. In providing this guidance, the Supreme Court did

not indicate that a state legislature elected under a malapportioned legislative map

might be powerless or semi-powerless.  Likewise, in applying this guidance in *Pender*

*County*, we were not concerned that requiring the next election cycle to proceed under

the unconstitutional 2003 House Plan would result in an impotent General Assembly.

Indeed, the legislators elected in 2008 served full terms and the validity of their

legislative actions has never been retrospectively questioned.  Notably, like in the

instant case, the malapportioned General Assembly elected in 2008, knowing that it

was malapportioned, proposed a constitutional amendment that was eventually enacted.[11]

¶ 135  Similarly, in *Drum v. Seawell* a North Carolina voter challenged article II, sections 5 and 6 of the North Carolina Constitution and the enacted House, Senate, and congressional reapportionment plans as violative of his rights under the Equal Protection Clause of the Fourteenth Amendment. *Drum v. Seawell*, 249 F. Supp. 877, 879 (M.D.N.C. 1965) (*Drum I*), *aff'd per curiam*, 383 U.S. 831, 86 S. Ct 1237, 16 L. Ed. 2d 298 (1966). At the time, article II, sections 5 and 6 of the North Carolina Constitution governed apportionment of the House and provided that the House would have one hundred twenty members with each county receiving at least one representative. *See id.* at 880, N.C. Const. of 1868, art. II, § 5 (1875).  The court held that this apportionment scheme violated the Equal Protection Clause because it "requir[ed] that each county be afforded at least one Representative regardless of its population" and declared the constitutional provisions "null and void." *Id.*, 249 F. Supp. at 880.  In addition to invalidating the challenged House reapportionment plan,

---

[11] The General Assembly elected in 2008 enacted House Bill 1307, which proposed an amendment to Article VII, section 2 of the North Carolina Constitution to prohibit felons from serving as sheriffs.  *See* An Act to Amend the Constitution of North Carolina to Provide that No Person Convicted of a Felony is Eligible to be Elected Sheriff, S.L. 2010-49, § 1, 2010 N.C. Sess. Laws 255, 255–56. It was approved by 84.96% of North Carolina voters. N.C. State Bd.                               of                               Elections, https://er.ncsbe.gov/?election_dt=11/02/2010&county_id=0&office=REF&contest=0      (last visited August 1, 2022); *see also* John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 170 (2d ed. 2013) ("In 2010 the voters approved an amendment that prevents convicted felons from serving as sheriff . . . .").

which had been enacted in 1961 (the 1961 House Plan), the court found the disparities in population among the fifty Senate districts, which had been enacted in 1963 (the 1963 Senate Plan), were also null and void. *Id.* at 880–81. Finally, the court held that the statute creating the State's eleven congressional districts was unconstitutionally discriminatory. *Id.* at 880.

¶ 136    Having thus determined all three plans were unconstitutional, the court ordered the existing General Assembly to reapportion the State "as nearly equally as possible on a population based representation." *Id.* at 881. This mandate required a substantial, if not total, overhaul of the 1961 House Plan and the 1963 Senate Plan. By the time the court filed its *Drum I* opinion on November 30, 1965, however, the 1963 Senate Plan had been used in the 1964 election cycle, and the 1961 House Plan had been used in both the 1962 and 1964 election cycles. Thad Eure, N.C. Sec'y of State, *North Carolina Government* 1585-1979: A Narrative and Statistical History 534, 536 (John L. Cheney, Jr. ed., 2d ed. 1981). Accordingly, most, if not all, of the 1965 General Assembly ordered by *Drum I* to reapportion the state's House, Senate, and congressional seats hailed from unconstitutional districts. Nonetheless, like this Court's decision in *Pender County*, the court in *Drum I* expressed no concern that the unconstitutionally constituted 1965 General Assembly could exercise its authority to apportion legislative districts or otherwise utilize its legislative power. The court simply ordered the malapportioned General Assembly to redraw all three

apportionment maps in time for the 1966 election cycle and permitted the incumbent legislators to finish their terms. 249 F. Supp. at 881. The General Assembly at issue there continued to exercise its legislative authority completely unfettered; again, a constitutional amendment was proposed that was subsequently approved by the voters of North Carolina.[12]

¶ 137    In accord with the remedial order in *Drum I*, the 1965 General Assembly reapportioned its House, Senate, and congressional districts before the 1966 primaries, but the same plaintiff, representing a group of North Carolina litigants, again challenged all three remedial plans. *Drum v. Seawell* (*Drum II*), 250 F. Supp. 922, 923–24 (M.D.N.C. 1966). After examining the remedial plans, the Middle District of North Carolina determined that the new House and Senate plans met "the minimum federal constitutional standards," but the redrawn congressional plan was still "constitutionally invalid." *Id.* at 924, 925. Nevertheless, in ordering a remedy, the court chose to permit the 1966 congressional elections to proceed under the unconstitutional remedial map:

---

[12] The 1965 General Assembly successfully proposed an amendment to the North Carolina Constitution that authorized the creation of the Court of Appeals. *See* An Act to Amend Article IV of the Constitution of North Carolina to Authorize Within the Appellate Division of the General Court of Justice an Intermediate Court of Appeals, ch. 877 § 1, 1965 N.C. Sess. Laws 1173, 1173–74. On 2 November 1965, 73.61% of voters approved the amendment, Thad Eure, N.C. Sec'y of State, *North Carolina Manual 1967*, at 328, and the General Assembly enacted legislation establishing the Court of Appeals in 1967. *See* An Act to Create a Court of Appeals, ch. 108, § 1, 1967 N.C. Sess. Laws 144, 144–55. Since its establishment, the existence of the Court of Appeals has never been questioned.

> While we feel bound to reject the [congressional] plan, we nevertheless recognize the good faith effort of the Legislature to bridge the tremendous gulf which existed between the status quo and the constitutional requirements. We also recognize the obligation of the federal courts to defer to the prerogative of the legislative branch of the State in this field. Recognizing also the imminence of the 1966 primaries, we, in the exercise of our equitable discretion, will stay our mandate further and permit the congressional elections of 1966 to take place under the [remedial congressional plan].

*Id.* at 925. Similar to *Pender County* and *Reynolds*, the *Drum II* opinion expressed no concern that permitting an election under the unconstitutional congressional plan might result in a congressional delegation that lacked the power to legislate.

Once again, in 1984, the Eastern District of North Carolina mandated the exact same remedy when it declared North Carolina's legislative maps invalid under the Voting Rights Act (VRA) and ordered the General Assembly to redraw them. *See Gingles v. Edmisten*, 590 F. Supp. 345, 350, 376 (E.D.N.C. 1984). In April 1982, the General Assembly enacted new House and Senate redistricting maps based on the 1980 decennial census (the 1982 Legislative Plans). *Id.* at 351. A group of registered voters in North Carolina challenged the 1982 Legislative Plans as violative of Section 2 of the VRA, alleging that, in designing and enacting these plans, the legislature strategically "ma[d]e[ ] use of multi-member districts" in certain parts of the state to "dilute[ ] the voting strength" of black voters. *Id.* at 349. In January 1984, the court determined that the challenged districts—five multi-member House districts, one

multi-member Senate district, and one single-member Senate district—all violated Section 2 of the VRA and had to be redrawn. *Id.* at 349–50. However, by the time the court reached its decision, the 1982 Legislative maps had already been used in the 1982 election cycle, *see* Thad Eure, N.C. Sec'y of State, *North Carolina Manual 1983-1984*, at 199–200, 287–89, 949–54 (John L. Cheney, Jr. ed), meaning the 1983 General Assembly was malapportioned.

¶ 139     In designating a remedy, in *Gingles* the court simply ordered the malapportioned 1983 General Assembly to redraw the problematic maps by March 1984, writing that "[i]n deference to the primary jurisdiction of state legislatures over legislative reapportionment, we will defer further action to allow the General Assembly of North Carolina an opportunity to exercise that jurisdiction in an effort to comply with § 2 [of the VRA] in the respects required." *Gingles*, 590 F. Supp. at 376 (citation omitted). The Supreme Court affirmed the *Gingles* holding, including its remedy, as to all but one challenged district. *Thornburg v. Gingles*, 478 U.S. 30, 80, 106 S. Ct. 2752, 2781, 92 L. Ed. 2d 25 (1986). Just as the courts in *Pender County*, *Reynolds*, and *Drum I* had done, neither the Eastern District of North Carolina nor the United States Supreme Court restricted the authority of the malapportioned 1983 General Assembly to redraw the legislative maps or otherwise exercise legislative authority. The 1983 General Assembly continued to exercise the full scope of its legislative authority, successfully proposing two constitutional amendments that

were approved by North Carolinians in 1984.[13]  The validity of those amendments has never been questioned.

¶ 140       Without explanation, the majority overlooks these cases and extends the remedial authority of this Court further than ever before.  This majority's avoidance of our jurisprudence is not, however, an isolated incident.  In recent weeks, this same majority acted to expedite oral argument in another case that, like this one, implicates this Court's power to police the General Assembly.  *See Harper v. Hall*, No. 413PA21, 2022 WL 2982880 (N.C. July 28, 2022) (Order on Motion for Expedited Hearing and Consideration).  As explained by the dissent to that order, the majority chose to expedite the pending appeal in *Harper*, which involves the validity of legislative and congressional redistricting maps, despite "the absence of any identifiable jurisprudential reason."  *Harper*, 2022 WL 2982880, at *1 (Barringer, J., dissenting).  The same is true here.

---

[13] The 1983 General Assembly proposed a constitutional amendment to permit "the General Assembly [to] enact general laws to authorize the creation of an agency to issue revenue bonds to finance the cost of capital projects consisting of agricultural facilities." *See* An Act to Amend Article V of the Constitution of North Carolina to Authorize the General Assembly to Create an Agency to Issue Revenue Bonds to Finance Agricultural Facilities Projects, Subject to the Approval of the Electorate, ch. 765, § 1, 1983 N.C. Sess. Laws 885, 885. On May 8, 1984, 53.87% of voters approved this amendment. N.C. Sec'y of State, *North Carolina Manual 1985-1986* at174–75 (John L. Cheney, Jr. ed.). The same General Assembly also proposed a constitutional amendment requiring that the Attorney General and District Attorneys to be duly authorized to practice law. *See* An Act to Amend the North Carolina Constitution to Require that District Attorneys and the Attorney General be Licensed to Practice Law, ch. 298, §§ 1-2, 1983 N.C. Sess. Laws 225, 225. Over seventy-five percent of North Carolina voters approved this amendment on November 6, 1984. N.C. Sec'y of State, *North Carolina Manual 1985-1986* at 176–77 (John L. Cheney, Jr. ed.).

¶ 141    The majority clearly appreciates that the idea of voiding all legislative authority would inevitably result in the chaos and confusion courts have heretofore protected against. The problem with this conclusion, however, is that this exercise of judicial selectivity creates *greater* chaos and confusion. If authority is ephemeral, how does one truly know when the General Assembly possesses the power to act? What about members of Congress elected from unlawful districts—would they also lose the power to vote on proposed federal constitutional amendments?

¶ 142    The majority attempts to position its decision as a narrow one only related to constitutional amendments. It is unclear, however, why the logic applied here would not apply to other actions taken by the legislature—or that legislatures may take in the future.

¶ 143    Indeed, overriding a governor's veto similarly requires three-fifths of the members of both chambers of the General Assembly's approval. N.C. Const. art. II, § 22. In the same 2018 session and within weeks of the constitutional amendments being proposed, the legislature overrode the governor's veto three times.[14] The majority declines to answer why veto overrides are not similar in kind to the issue here, but individuals or groups who advocated against the veto overrides would

---

[14] Interestingly enough, one of these pieces of vetoed legislation was the state budget.

almost certainly seize upon the Court's reasoning to apply this decision to other actions of the legislature.

¶ 144      Further, if constitutional amendments are the sole focus, would ratifying amendments to the federal Constitution be within the purview of this decision? Votes to ratify such amendments only require a simple majority in the legislature. A malapportioned legislature ratified the Twentieth Amendment on January 5, 1933. Under the majority's reasoning here, is this ratifying vote voidable?

¶ 145      To suggest that legislation passed by the 2018 General Assembly, which is not reviewable by the people, is beyond the reach of this decision, while acts of the legislature which are passed upon by the people are suspect, defies logic. Legislative defendants argue as much, contending that there is "no principled way to distinguish between the constitutional amendments the plaintiffs have challenged in this litigation and all the other legislative acts the challenged legislators undertook." Judges should "believe in the validity of the reasons given for [their] decision at least in the sense that [they are] prepared to apply them to a later case in which [they] cannot honestly distinguish." Louis L. Jaffe, *English and American Judges as Lawmakers*, 38 (1969). In limiting their analysis, my colleagues demonstrate just how ill-founded their reasoning is.

¶ 146      In discussing legislative defendants' argument regarding this point, the majority specifically focuses on the case of *Dawson v. Bomar*. Interestingly, the

majority dedicates two pages to *Dawson* simply to conclude its inapplicability to the instant case. Whether this is an attempt by the majority to convince the public, or frankly themselves, of *Dawson's* irrelevance, an objective look at the case leads us to a different conclusion.

¶ 147          In *Dawson*, the petitioner, a prisoner, filed a habeas corpus action against the warden of the Tennessee State Penitentiary. 322 F.2d 445, 446 (6th Cir. 1963). The petitioner challenged the authority of the Tennessee Legislature, which was allegedly malapportioned at the time, to enact capital punishment legislation. *Id.* Specifically, and eerily similar to the instant case, the petitioner in *Dawson* requested that the court draw a distinction between ordinary, routine laws, which must be allowed to stand to prevent chaos, and the challenged capital punishment laws enacted by the legislature due to their "unique nature." *Id.* at 447. The *Dawson* court began by explaining, however, that "[c]ourts will refrain from declaring legislative acts unconstitutional, even though the legislature may itself have been adjudicated to have been unconstitutionally constituted by reason of malapportionment, where the result would be to create chaos and confusion in government." *Id.* The *Dawson* court went on to point out that "courts have uniformly held that otherwise valid enactments of legislatures will not be set aside as unconstitutional by reason of their passage by a malapportioned legislature." *Id.* at 447–48.

¶ 148        Moreover, in addressing the petitioner's argument that a carved-out exception should be made for the challenged legislation specifically, the court properly declined to treat one type of legislation different from any other. Indeed, the *Dawson* court emphasized the danger such judicial intrusion would breed:

> For the Court to select any particular category of laws and separate them from other laws for the purpose of applying either the *de facto* doctrine or the doctrine of avoidance of chaos and confusion would in fact circumvent legal principles in order to substitute the Court's opinion as to the wisdom, morality, or appropriateness of such laws. The personal views of members of the court with regard to [the substance of a law] should not be grounds for withdrawing such laws from the operation of established principles of law. The purpose of both the *de facto* doctrine and the doctrine of avoidance of chaos and confusion would be defeated if the judiciary could be called upon to adjudicate respective equities between the public and the complaining party as to any specific act. Both doctrines must have *overall application* validating the otherwise valid acts of a malapportioned legislature, with a judicial severance of specific acts and a weighing of equities as to those specific acts precluded, if a government of laws and not of men is to remain the polar star of judicial action.

*Id.* at 448 (emphasis added). Understanding that courts may not hand-pick legislation to legitimize, the court concluded that the plaintiff's argument was without merit.

¶ 149        The majority "misread[s] *Dawson*," claiming that it "held only that in applying the de facto officer doctrine, courts should not draw distinctions between categories of *ordinary* statutes" and remained silent on "how courts should approach

109

categorically different types of legislative acts." The *Dawson* court, however, never once made such a distinction, if one even exists.[15] Reaching the same conclusion as countless other federal and state decisions, *Dawson* simply calls for "overall application" of the *de facto* doctrine to "the otherwise valid acts of a malapportioned legislature." *Id.* No exceptions.

¶ 150     Today, the Court's actions are directed at state constitutional amendments. The door has been opened, however, for judicial dissolution of legislative authority in the future. This is a far cry from judicial restraint and thwarts the idea that "there is no room for a judicial hegemony." *Walser ex rel. Wilson v. Jordan*, 124 N.C. 683, 705, 33 S.E. 139, 151 (1899) (Clark, J., dissenting). This Court's "authority is limited, and the acceptance of that limitation is a public trust we are bound to keep in the promotion of a properly aligned government." *Rhyne v. K-Mart Corp.*, 149 N.C. App. 672, 680, 562 S.E.2d 82, 89 (2002), *aff'd*, 358 N.C. 160, 594 S.E.2d 1 (2004).

---

[15] Notably absent from our constitution is the categorization of constitutional functions as "ordinary" or "extraordinary." Further, and contrary to the majority's view of our constitution, there is nothing extraordinary about any duties or obligations set forth therein. The constitution sets forth the rights enjoyed by the people and provides the framework for action by our government. There is no hierarchy of constitutional rights, and nothing concerning operation of our government is designated ordinary or extraordinary. The majority has taken it upon itself to rank governmental functions based solely on its own opinion. What happens then when they decide to take the same approach to the freedoms and liberties secured in the Declaration of Rights?

¶ 151     That the majority has injected chaos and confusion into our political structure is self-evident. Equipped with a few paragraphs of instruction, our state's courts may now decide if and when constitutional authority may be exercised by another branch of our government. It takes minimal effort to imagine the ways that this could ultimately "preempt the people's capacity to [ ] assert their will consistent with the terms of their fundamental law" following their approval of a constitutional amendment. "The idea of . . . the judiciary [] preventing . . . the legislature, through which the people act, from exercising its power is the most serious of judicial considerations." *State ex rel. McCrory v. Berger*, 368 N.C. at 650, 781 S.E.2d at 259 (2016) (Newby, J., concurring in part and dissenting in part).

### III. Conclusion

¶ 152     Our constitution clearly states that amending the constitution is a duty designated to the General Assembly and the people of this State. The General Assembly acted within its constitutional authority when it proposed the Voter ID and Tax Cap Amendments to the people of North Carolina. The people overwhelmingly ratified these provisions which they believed important to safeguard elections and protect their wallets.

¶ 153     This decision is a radical departure from mere judicial review as this Court expands its reach beyond constitutional guardrails and unilaterally amends the constitution for its own reasons. The majority restructures power constitutionally

111

designated to the legislature, plainly violates the principles of non-justiciability, and wrests popular sovereignty from the people.

¶ 154     When does judicial activism undermine our republican form of government guaranteed in Article IV, Section 4 of the United States Constitution such that the people are no longer the fountain of power?  At what point does a court, operating without any color of constitutional authority, implicate a deprivation of rights and liberties secured under the Fourteenth Amendment?

¶ 155     The sober people of this state will be left to wonder why, if they amended the constitution, those provisions are not in effect.  The negative fallout of today's decision will be felt most by the people of this state and the confidence they have in this institution.  Sadly, they will experience the chaos and confusion courts seek to avoid.

Chief Justice NEWBY and Justice BARRINGER join in this dissenting opinion.